Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/03/2019 08:06 AM CST

Laura B. Schnackel, appellee and cross-appellant,
v. Gregory R. Schnackel, appellant
and cross-appellee.

___ N.W.2d ___

Filed November 26, 2019.    No. A-18-428.

1. **Divorce: Appeal and Error.** In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Property Division.** Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and determine the marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

4. **Divorce: Property Division.** As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule.

5. **Taxation: Corporations: Words and Phrases.** Subchapter S is a tax status designed to tax corporate income on a pass-through basis to shareholders of a small business corporation.

6. **Taxation: Corporations.** Since a subchapter S corporation is not taxed on its earnings, the various income, expense, loss, credit, and other tax items pass through and are taxable to or deductible by shareholders in a manner analogous to that which is applicable to partners.

7. **Property Division.** With some exceptions, the marital estate does not include property acquired by one of the parties through gift or inheritance.

8. **Property Division: Proof.** The burden of proof to show that property is nonmarital remains with the person making the claim.

9. **Property Division: Words and Phrases.** Dissipation of marital assets is generally defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown.

10. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

11. **Divorce: Appeal and Error.** In a de novo review of a judgment in marriage dissolution proceedings, when the evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

12. **Divorce: Property Division.** When marital assets are dissipated by a spouse for purposes unrelated to the marriage, the remedy is to include the dissipated assets in the marital estate in dissolution actions.

13. **Property Division.** As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

14. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. In addition, a court should consider the income and earning capacity of each party and the general equities of the situation.

15. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

16. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness.

17. **Child Support: Rules of the Supreme Court.** The Nebraska Child Support Guidelines do not apply if the parties have no minor children.

18. **Divorce: Property Division: Alimony.** The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately.

19. **Alimony.** Alimony should not be used to equalize the incomes of the parties or punish one of the parties, but disparity in income or potential income may partially justify an award of alimony.

20. **Judgments.** A court has discretion to require reasonable security for an obligor's current or delinquent support obligations when compelling circumstances require it.

21. **Judgments: Alimony: Child Support.** An order requiring security to be given is a somewhat extraordinary and drastic remedy, and therefore, reasonable security for payment of alimony, child support, or monetary judgments should only be invoked when compelling circumstances require it.

22. **Divorce: Property Division: Presumptions.** Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves that (1) the growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse.

23. **Divorce: Property Division.** The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of the appreciation or income.

Appeal from the District Court for Douglas County: Horacio J. Wheelock, Judge. Affirmed as modified.

Michael W. Milone and Mark J. Milone, of Koukol & Johnson, L.L.C., for appellant.

Edward D. Hotz, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellee.

Riedmann, Bishop, and Arterburn, Judges.

Riedmann, Judge.
## I. INTRODUCTION
Gregory R. Schnackel (Greg) appeals, and Laura B. Schnackel cross-appeals, the order of the district court for Douglas County which dissolved the parties' marriage, valued and divided the marital estate, and awarded alimony and child support to Laura. For the reasons that follow, we affirm the district court's order as modified.

## II. BACKGROUND

Greg and Laura were married in 1985 and had two children during the marriage. The older child had reached the age of majority before dissolution proceedings began, but the younger child had not. However, he turned 19 years old during the pendency of this appeal.

Laura filed a complaint for dissolution of marriage in July 2016. Trial was held over the course of several days in October 2017 and February 2018. The parties amassed significant assets during their marriage, and the record in this case is voluminous. Trial culminated in an extremely thorough, well-supported 96-page amended decree, plus attachments, by the district court. We briefly summarize the evidence presented at trial here and will include additional facts below as necessary to address the issues raised on appeal and cross-appeal.

After graduating from college in 1984, Greg began working for an engineering company owned and operated by his father, Dale Schnackel. In 1994, Dale created a partnership and gave Greg a 50-percent interest in it. In 2000, Dale transferred the remaining 50-percent interest in the partnership to Greg at a value of $106,750. As will be discussed below, there is a dispute as to whether the 2000 transfer from Dale to Greg was a gift or a purchase. After Greg gained control of the partnership, he transferred all of its interests into a newly formed Nebraska corporation, and in 2007, he changed the name of the corporation to Schnackel Engineers, Inc. (SEI).

AEA Integration, Inc. (AEA), was formed in 2003, and Greg is the president and sole shareholder. AEA is in the process of developing software to be used by SEI. SEI is currently AEA's only customer, and through 2016, SEI had spent approximately $7.5 million in development costs for AEA. The software is not ready for use outside of SEI, and Greg estimated that it would not be ready for at least 5 more years.

Greg and Laura each called an expert witness to testify at trial as to the valuation of SEI and AEA. In the amended decree, the district court found both experts to be credible

but determined that the testimony, methodology, and conclusions of Laura's expert, Matthew Stadler, were more truthful, credible, and reliable than that of Greg's expert. This determination is not challenged on appeal. Stadler opined that as of June 30, 2017, SEI had a value of $3,267,900. He testified that AEA had no separate value because it had no income or revenue and was completely dependent upon SEI.

In 2006, Greg purchased a condominium in New York City to use while working in New York. SEI paid the $28,000 monthly rent for the condominium. Greg sold the condominium in 2017 and leased a different New York apartment for $11,000 per month.

Greg met another woman, Julia Weiss (Julia), in New York around 2010. Around this time, Greg was working in New York an average of 150 to 180 days per year. In September 2013, Greg told Julia that he wanted to marry her, and they began a sexual affair at that time. In order to conceal the affair from Laura, Greg opened a separate credit card account, referred to throughout the record as the "9779 account." Greg used the 9779 account to charge purchases related to Julia. Greg spent substantial amounts of money on Julia, providing gifts of jewelry to her, taking her on trips, giving her cash, paying her credit card bill, and buying clothes and shoes for her.

Laura discovered the affair in April 2015, and she and Greg began attending marriage counseling in June. After just a few sessions, the counseling transitioned to divorce counseling because Greg said he was unwilling to end his relationship with Julia. Despite this, Greg continued to live at the marital residence and sleep in the marital bedroom, until Laura "demoted" him to a bedroom in the basement in June 2016. Greg moved out of the marital home on August 28, 2016.

The amended decree was entered in March 2018. As relevant to this appeal, the district court valued and divided the marital portion of SEI, finding that after subtracting the present value of the 1994 gift from Dale to Greg, SEI had a total

marital value of $3,096,828.80. Of this amount, $1 million was awarded to Laura's share of the marital estate, and the remaining $2,096,928.80 was attributed to Greg's portion.

The court concluded that Greg dissipated a total of $3.5 million in marital assets in connection with his spending on Julia and that Laura dissipated $146,000 in marital assets, and it divided those amounts accordingly. Greg was ordered to pay alimony to Laura of $7,500 per month for 120 months. Laura inherited funds during the marriage, and the district court awarded Greg half of the total marital gains of her inheritance. The parties were ordered to sell two condominiums they own in Florida and Greg's classic car collection in order to pay off marital debt. Based on its calculations and division of the marital estate, the district court determined that a total equalization payment was owed to Laura of $1,664,741 and ordered Greg to make payments to Laura of $8,670.52 per month for 192 months. Additional details will be provided below. Greg now appeals, and Laura cross-appeals.

## III. ASSIGNMENTS OF ERROR

On appeal, Greg assigns that the district court erred in (1) valuing and dividing the marital estate, (2) its analysis and findings regarding dissipation of marital assets, (3) its alimony award, and (4) issuing postdecree orders.

On cross-appeal, Laura assigns that the district court erred in classifying the appreciation of her inherited funds as a marital asset.

## IV. STANDARD OF REVIEW

[1,2] In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving

a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. Property Division

[3] In his first assigned error, Greg asserts that the district court committed several errors regarding the classification, valuation, and/or division of marital property. Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and determine the marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Stephens v. Stephens, supra*.

### (a) Necessary Parties

Greg first alleges that the district court erred in dividing AEA's assets. He claims that because AEA was not made a party to the action, a necessary party was absent, and that the district court therefore lacked the authority to divide AEA's assets. Greg does not cite any Nebraska authority to support his position, and we have found none. To the contrary, in previous dissolution of marriage actions, this court and the Nebraska Supreme Court have addressed the valuation of a business and treatment of the business as a marital asset without requiring that the business be brought in as a party to the case. See, e.g., *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003); *Logan v. Logan*, 22 Neb. App. 667, 859 N.W.2d 886 (2015). We therefore reject this argument.

### (b) AEA's Future Profits and Stock

Greg makes several additional arguments regarding the district court's treatment of AEA. In summary, he claims the court should not have divided AEA's future profits between

the parties and should not have awarded Laura 50 percent of AEA's issued and outstanding stock.

Greg owns 100 percent of the 1,000 outstanding shares of AEA capital stock. AEA's articles of incorporation specify that AEA has the authority to issue 10,000 shares of capital stock. In the amended decree, the district court awarded Laura 50 percent of all issued and outstanding capital stock in AEA, or 500 shares. In addition, the amended decree required that Greg and/or SEI pay all of AEA's future research and development costs and that upon AEA's making a profit, Greg is entitled to recover all expenses he paid personally or through SEI as of the date of the amended decree forward, and any profits after expenses have been repaid are to be divided equally between Greg and Laura.

[4] Greg first argues that AEA's future profits should not be considered marital property because they were not earned during the marriage and are too speculative to quantify. As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).

The Nebraska Supreme Court has previously addressed whether a trial court erred when it treated future compensation due to a husband as marital property. In *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017), the husband began working for an insurance company during the marriage, and according to an agreement between him and the company, upon termination of the agreement and certain contingencies being met, he was entitled to two forms of termination payments. The trial court treated both types of payments as marital assets and divided them equally between the parties.

On appeal, the husband argued that the payments should have been classified as nonmarital property, because at the time the decree was entered, it was uncertain whether he would actually receive the payments and, if so, what the value of the payments would be. The Supreme Court in *Bergmeier*

noted that although the husband did not have an indefeasible right to the payments, he did have an accrued contractual right subject only to minimal qualifying conditions, recognizing that the husband may choose to squander the contractual right or forfeit it by violating certain provisions in the contract. However, the Supreme Court determined that these factors should not affect the payments' status as marital property. The Supreme Court was persuaded that the contract, which was acquired during the marriage, had a substantial value and was properly considered as part of the marital estate.

The Supreme Court in *Bergmeier* observed that other jurisdictions have determined that termination payments under the same contract have no value for division as marital property, because the actual value of the contract depends on the activities of the husband that occur after the marriage has been dissolved. But the Supreme Court decided that this fact did not lead to the conclusion that the wife should be denied any interest whatsoever in a substantial asset which was acquired during the marriage. Accordingly, the Supreme Court held that the trial court did not err when it determined that the payments were marital property. The Supreme Court did, however, conclude that the trial court abused its discretion when it assigned a specific value to the payments and awarded the wife 50 percent of that value.

Likewise, in the present case, although it is not certain that AEA will earn a profit in the future, and whether it does so is within Greg's control, these factors do not require the conclusion that any future profits are not marital property. To the contrary, AEA was formed during the marriage and more than $7.5 million in marital assets have been invested into the company. According to Laura's expert, AEA has no current value independent of SEI, which the district court properly treated as a marital asset.

In *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017), the Supreme Court found error in assigning a value to the termination payments because, inter alia, the value chosen

was stale, it was not warranted by the facts, and the actual value depended on factors that had not yet occurred, such as the date of the husband's termination and total sales for the 12 months immediately preceding his termination. The court also determined that it was an abuse of discretion to award the wife 50 percent of the termination payments because payments to her are dependent on the amount of time the husband will have been in a working relationship with the insurance company both during and after the marriage when the husband starts receiving the termination payments. As to how to calculate what percentage of the termination payments the wife should receive, the Supreme Court looked to divorce cases involving pensions, noting that the marital estate includes only the portion of the pension which is earned during the marriage and that contributions to pensions before marriage or after dissolution are not assets of the marital estate.

Here, the district court did not assign a value to the future profits. And we find *Bergmeier* distinguishable in this respect, because in the present case, AEA has not yet earned a profit, but the parties have invested significant marital assets into the company. In addition, Greg is permitted to recover any additional research and development costs invested by SEI or Greg before dividing future profits with Laura. Based on the record before us, we conclude that the district court did not abuse its discretion in awarding Laura half of the corporation's future profits after Greg's recoupment of future research and development costs.

We also find no abuse of discretion in awarding Laura 50 percent of the issued and outstanding shares of AEA. The record does not include a copy of AEA's bylaws, so it is unclear what rights those 500 shares give to Laura or whether Greg has the ability to issue additional shares to himself in order to retain the majority ownership of AEA. But under the Nebraska Model Business Corporation Act, Neb. Rev. Stat. § 21-201 et seq. (Cum. Supp. 2018), ownership of the shares grants certain rights to Laura, such as the right to receive

the corporation's annual financial documents (§ 21-2,227), the right to inspect and copy records of the corporation (§ 21-2,222), and the right to commence a derivative action on behalf of the corporation (§ 21-276). Given that Laura is entitled to a portion of AEA's future profits, she may want or need to exercise these rights in the future.

Greg argues that awarding Laura stock in AEA is contrary to established Nebraska law that disfavors awards of jointly owned property. While such practice may be disfavored, it is not prohibited. See, e.g., *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004) (remanding with directions to award wife seven shares of stock in family corporation owned by former in-laws with remainder awarded to husband). For the reasons stated above, we find no abuse of discretion in the court's decision to award Laura 500 shares of AEA.

### (c) Marvel Schnackel's Transfers

Greg claims that the district court erred in its treatment of money given to SEI by his mother, Marvel Schnackel. During the marriage, Marvel transferred significant amounts of money to SEI. The transfers were made by Greg, using his power of attorney over Marvel's personal and financial affairs. A revolving promissory note between SEI and Marvel for $1 million was received into evidence at trial. The note was executed after the initial transfer occurred, was backdated, and did not include Marvel's signature.

According to Stadler, the parties' accountant told him that the funds from Marvel were classified as loans to SEI for tax purposes, and thus, Stadler treated the money extended by Marvel as a contribution to capital. Based on Stadler's classification, the district court also treated Marvel's extension of money as a contribution of capital to SEI rather than as a loan from Marvel to SEI.

Greg argues that the court had the option of classifying the money as either a loan to SEI or a gift to Greg personally. We find no abuse of discretion in the treatment of these funds.

In *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000), the husband argued that a share of stock in his family corporation that he received during the marriage was a gift from his parents, rather than a purchase made with marital funds. The husband testified at trial that he and his father negotiated an agreement in which he became the owner of one share of the corporation's stock, and a letter from an attorney was received into evidence wherein the attorney opined that the stock should be purchased by the husband. A stock purchase agreement received into evidence referred to the husband as a buyer and the husband's father as a seller. Despite this evidence, the husband and his mother testified at trial that the stock was a gift. The trial court found that the stock was marital property.

The husband appealed in *Heald*, arguing that the trial court erred in failing to treat the stock as a gift, thereby excluding it from the marital estate. The Supreme Court disagreed, noting that although both the husband and his mother testified that the stock was a gift, the stock purchase agreement, the attorney letter, and the wife's testimony suggested otherwise. Upon its de novo review, the Supreme Court considered and gave weight to the fact that the trial court heard and observed the witnesses and accepted the wife's testimony and the related inferences from the evidence. The court therefore concluded that the trial court did not err in including the stock in the marital estate.

[5,6] Likewise, in the instant case, there was evidence from which the district court could have concluded that the funds from Marvel were loans to SEI which were intended to be repaid, but there was also evidence which would support a contrary conclusion. SEI is a subchapter S corporation owned 100 percent by Greg. Subchapter S is a tax status designed to tax corporate income on a pass-through basis to shareholders of a small business corporation. *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003). Since a subchapter S corporation is not taxed on its earnings, the various income, expense, loss,

credit, and other tax items pass through and are taxable to or deductible by shareholders in a manner analogous to that which is applicable to partners. *Id*. Greg testified that the funds received from Marvel were loans and that interest on the loans was accrued and owing. As the district court noted, Greg used his power of attorney over Marvel to transfer the money and later issued a backdated promissory note.

The accountant who prepares the parties' tax returns told Stadler that the funds from Marvel were treated as loans for tax purposes to avoid treating them as capital gain income subject to taxes. The fact that the funds were treated as loans for tax purposes does not mandate similar treatment here. Stadler explained that he treated the transaction as Marvel's giving money to Greg, as the sole owner of a subchapter S corporation, who then transferred the money into SEI. Stadler noted that in several instances, SEI's general ledger depicts transfers of the amounts purportedly from Marvel as coming from Greg directly. In conducting our de novo review, we give weight to the district court's consideration of the conflicting evidence and conclude that the court did not abuse its discretion in its treatment of the funds received from Marvel.

### (d) Dale's Transfers

[7,8] Greg also challenges the district court's failure to classify two transfers received from Dale as gifts. It is well-established that as a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. See, e.g., *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000). With some exceptions, the marital estate does not include property acquired by one of the parties through gift or inheritance. *Id*. The burden of proof to show that property is nonmarital remains with the person making the claim. *Id*. Thus, the burden was on Greg here to prove that the transfers from Dale were gifts.

Greg asserts that funds totaling $100,000 received from Dale in 2009 should have been considered as gifts to him. The district court observed that Greg transferred $100,000 to SEI in three separate transfers in 2009, from the proceeds of funds from Dale. The evidence indicates that Greg received a total of $140,000 from Dale and Marvel in 2009 and that he transferred $100,000 of the funds into SEI. Greg testified that the remaining $40,000 was used to pay marital expenses and that although his parents loaned him money, they forgave the loans. The district court, noting the testimony from the parties' accountant that the $100,000 was never withdrawn from SEI and was presently part of SEI's existing capital, decided that, consistent with its treatment of funds from Marvel, it would treat the $100,000 as contributions of capital to SEI. As in our analysis above concerning the transfers from Marvel, we likewise find no abuse of discretion in the district court's decision to treat the funds from Dale as capital contributions rather than gifts.

Greg also argues that the 2000 transaction in which he acquired the remaining 50-percent interest in what is now known as SEI should have been classified as a gift from Dale. Greg testified at trial that effective January 1, 2000, he purchased the remaining 50-percent interest in the company now known as SEI from Dale. According to Greg, he and Dale agreed that Greg would pay Dale $106,750 and sign a promissory note, but the note was never signed and Greg never paid. Greg said that he and Dale "arranged a deal whereby [Dale] would effectively sell the company to [Greg] at $106,750 and then forgive that loan, so effecting a transfer of the firm without tax implications." Despite this agreement, according to Greg, no promissory note was prepared and he never paid the purchase price; instead, part of the arrangement was that in order for Dale to "gift" the company to Greg, Dale would forgive the purported debt. Greg acknowledged that there was nothing in writing to indicate that the $106,750 debt was forgiven, and the $106,750 figure was not recorded

in any government filing, state or federal. Greg said that he would not know whether Dale paid income taxes on the forgiven debt.

In the amended decree, the district court observed that Greg agreed to sign a promissory note to pay Dale for the interest, but that a note was never executed and Greg never paid Dale for the remaining 50 percent of the partnership. The court noted that there was no evidence to corroborate a finding that the interest was a gift from Dale to Greg; rather, the court found that Dale and Greg had a deal based upon consideration. The court therefore found that Greg failed to prove that the interest he received in SEI was a gift, and as a result, it was treated as marital property. Given the conflicting evidence presented as to this issue, we cannot find that the district court abused its discretion in concluding that Greg failed to meet his burden of proving that the interest he acquired in SEI was a gift.

### (e) Liquidation of Property

Greg next asserts that the district court erred in ordering him to sell his classic car collection and the Florida condominiums. He argues that it is unclear that liquidation was fair, reasonable, and necessary to ensure an equitable division of marital property.

In the amended decree, the district court noted that according to Greg and the parties' accountant, Greg and Laura will potentially have additional tax liabilities due in the future, which the court ordered to be paid equally between the parties out of an escrow account they used to pay marital obligations during the pendency of the dissolution proceedings. For example, the parties potentially owe an additional $423,517 in federal taxes and $84,703 in interest as a result of an Internal Revenue Service audit, which the parties have appealed, and the appeal remains pending. Depending on the results of the appeal of the audit, the parties may owe approximately $145,000 in additional taxes for 2015 and $75,000 for 2016.

Greg and Laura owe $363,800 in capital gain taxes due to selling the New York condominium in 2017. Additional taxes resulting from the sale of certain stock will be due in 2018 in an amount of at least $655,815. And finally, the parties will potentially owe capital gain taxes in the amount of $2.4 million related to a separate stock that will be liquidated.

The district court specifically ordered that the proceeds from the sale of the classic car collection and the Florida condominiums be used to pay off the parties' joint tax liabilities and debts. As of January 30, 2018, the escrow account had a balance of $292.63. Given the extent of the potential tax obligations compared to the balance of the escrow account, we find no abuse of discretion in requiring Greg to sell property in order to satisfy marital debts.

### (f) Treatment of $605,000 Loan

In his final argument regarding the division of property, Greg claims that the district court double counted a $605,000 payable by SEI. He notes that the court considered the payable to be a marital asset and divided it equally between the parties but failed to subtract its value from SEI's total business valuation.

In late 2017 and early 2018, SEI borrowed a total of $605,000 from the parties' escrow account, and during that same time period, Greg borrowed money from SEI. The district court recognized that Stadler's valuation of SEI was made as of June 30, 2017, and that the $605,000 in loans were made after that date. Thus, the business valuation of SEI does not take into consideration the $605,000, and we therefore disagree with Greg that this amount was double counted in the marital estate.

### 2. DISSIPATION OF MARITAL ASSETS

#### (a) Date Marriage Was Irretrievably Broken

Greg first asserts that the district court abused its discretion in determining that the marriage was undergoing an

irretrievable breakdown for dissipation purposes in September 2013. We disagree.

[9] Dissipation of marital assets is generally defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown. *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001). Although Nebraska case law does not precisely define when a marriage is undergoing an irretrievable breakdown, this court has previously declined to conclude that such breakdown can be found only when the parties are estranged or have separated. See *Malin v. Loynachan*, 15 Neb. App. 706, 736 N.W.2d 390 (2007).

In considering this issue, an Illinois appellate court determined that dissipation should be calculated from when the parties' marriage begins to undergo an irreconcilable breakdown, not from a date after which it is irreconcilably broken, because dissipation occurs at a time that the marriage is *undergoing* an irreconcilable breakdown. See *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 899 N.E.2d 355, 326 Ill. Dec. 138 (2008). Thus, dissipation can ordinarily be found based on conduct that occurred prior to the parties' separation or the filing of a dissolution petition. See, *In re Marriage of Harding*, 189 Ill. App. 3d 663, 545 N.E.2d 459, 136 Ill. Dec. 935 (1989); *In re Marriage of Rai*, 189 Ill. App. 3d 559, 545 N.E.2d 446, 136 Ill. Dec. 922 (1989). Although the Illinois court used the term "irreconcilable breakdown" rather than the term "irretrievable breakdown," it has noted more recently that the terms have been used interchangeably and that any attempt to distinguish them in a dissipation context is a distinction without a difference. See *In re Marriage of Romano*, 2012 IL App (2d) 091339, 968 N.E.2d 115, 360 Ill. Dec. 36 (2012).

Thus, here, the question for the district court was when Greg and Laura's marriage began to undergo an irretrievable breakdown. Greg urges us to find that the facts support a different, much later, date than that used by the district court.

He admits that his affair with Julia began in September 2013, but emphasizes that he took extensive steps at that time to conceal it from Laura and argues that the marriage was not irretrievably broken until he left the marital home in August 2016. We initially note that this position is inconsistent with the position Greg took at trial. There, he argued that as a matter of law, the date that the marriage was irretrievably broken was July 1, 2015, the time when marriage counseling transitioned to divorce counseling.

Regardless, based on the record before us, we find no abuse of discretion in the district court's conclusion that the marriage began undergoing an irretrievable breakdown in September 2013. At that time, Greg began a sexual affair, which he intended to maintain despite the fact that he was married. Greg expressed this intention when, during one of the early sessions of marriage counseling, he indicated his unwillingness to end the affair. At trial, Greg testified that he did not file for divorce from Laura, because he was afraid that Julia would leave him, and that he decided he wanted to continue the marriage and have an affair with Julia. In other words, Greg admitted that he "wanted [to have his] cake" and "eat it, too." He also admitted that he told Julia that he wanted to marry her in September 2013. At that same time, he opened the 9779 account in order to hide purchases related to Julia from Laura and began spending extravagant amounts of money on Julia, including clothing; jewelry; travel; education, medical, and dental expenses; and her separate credit card payments.

The fact that Greg was able to hide the affair from Laura until April 2015 is of no consequence. According to one treatise, "expenditures [on] paramours are almost always treated as dissipation." 2 Brett R. Turner, Equitable Distribution of Property § 6:106 at 831 (4th ed. 2019). The evidence establishes that Laura was not willing to stay in the marriage if Greg continued to see Julia, and Greg made clear that was his intent. Although the parties briefly attended marriage

counseling, once Greg iterated his intention of maintaining his relationship with Julia, counseling transitioned to divorce counseling and the parties began trying to reach an agreement on how to divide their marital property while maintaining the appearance of the marriage for the sake of their children. The situation was not one of a casual affair without benefit of forethought; rather, Greg's actions and intentions were inconsistent with a commitment to his marriage early on in the affair. Accordingly, we find that the district court did not abuse its discretion in concluding that the marriage began undergoing an irretrievable breakdown in September 2013.

### (b) Improper Theory

Greg asserts that the district court relied upon an improper standard of "'abandonment of the marriage'" as opposed to the proper standard of "'irretrievable breakdown of the marriage.'" Brief for appellant at 44 (emphasis omitted). We do not agree that the court used an improper standard. The district court specifically recognized that "[i]n determining the date after which expenses relating to Julia are to be classified as dissipated marital assets for purposes unrelated to the marriage, the [c]ourt must determine when the marriage was irretrievably broken." The court also relied on appropriate Nebraska case law discussing dissipation of marital assets, including *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001), and *Malin v. Loynachan*, 15 Neb. App. 706, 736 N.W.2d 390 (2007), as well as *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009), which iterate the proper standard. As such, we disagree that the court used an improper standard by which to determine dissipation of marital assets.

### (c) Hearsay Testimony

[10] Greg argues that the district court erred in overruling his hearsay objection regarding a conversation he had with his older child in August 2013. This argument was not specifically assigned as error, however, and we therefore decline to address it. To be considered by an appellate court, an

alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Chafin v. Wisconsin Province Society of Jesus*, 301 Neb. 94, 917 N.W.2d 821 (2018).

Even if we were to consider this argument, assuming without deciding that the district court erred in overruling Greg's hearsay objection, any reliance by the court on the conversation in its dissipation analysis was harmless error. As discussed above, the district court's determination that the marriage was undergoing an irretrievable breakdown in September 2013 was not an abuse of discretion. This is true without considering Greg's conversation with his older child. As detailed above, Greg began a sexual affair with Julia in September 2013, proposed to her, and began spending significant amounts of money on her. As such, any error related to the court's reliance upon what Greg argues was hearsay testimony was harmless.

### (d) Calculation of Dissipated Assets

Greg's final argument with respect to dissipation of marital assets is that the district court's calculations are incorrect and unsupported by the evidence. He claims that the court's dissipation analysis failed to give him credit for legitimate business and marital expenditures and that instead, the court adopted Laura's evidence as to dissipation rather than his evidence, which he claims was more credible.

Although no published Nebraska cases specifically articulate the burden of proof with regard to dissipation of marital assets, our case law appears to place the initial burden on the party alleging dissipation, and after sufficient evidence is produced, the burden shifts to the dissipating spouse to prove that the funds were spent for marital purposes. See, *Harris v. Harris, supra*; *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000). This is consistent with the standard set forth in a legal treatise, which provides that a party alleging dissipation of marital property has the initial burden of production

and persuasion. 27C C.J.S. Divorce § 998 (2016). See, also, 2 Brett R. Turner, Equitable Distribution of Property § 6:105 (4th ed. 2019). The waste and dissipation of marital assets must be established by a preponderance of the evidence. 27C C.J.S., *supra*. After a party establishes a prima facie case that monies have been dissipated, the burden shifts to the party who spent the money to produce evidence sufficient to show that the expenditures were appropriate. *Id*. The spouse charged with dissipation bears the burden of establishing by clear and convincing evidence how the funds were spent. *Id*. Vague and general testimony that marital assets were used for marital expenses is inadequate to meet the spouse's burden to show by clear and specific evidence how the funds were spent, and the trial court is required to find dissipation when the spouse charged with dissipation fails to meet that burden. *Id*.

Following this standard in the present case, the district court concluded that Laura proved by a preponderance of the evidence Greg dissipated marital assets at a time when the marriage was undergoing an irretrievable breakdown and that Greg failed to establish by clear and convincing evidence the missing funds were spent on a purpose related to the marriage. Both parties offered into evidence detailed exhibits outlining Greg's spending from the 9779 account. The district court relied on Laura's exhibits in the amended decree when it detailed its findings regarding dissipation. On appeal, Greg argues that his evidence was more credible than Laura's.

[11] In our de novo review of a judgment in marriage dissolution proceedings, when the evidence is in conflict, we consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016). Here, we give weight to the fact that the district court observed the testimony of both Greg and Laura and considered the evidence presented by each party, finding Laura's to be more credible than Greg's.

The court had before it bank records and summaries of the expenditures compiled by each party, but even Greg could not recall the exact purpose of each expenditure from the 9779 account.

The district court determined that Greg dissipated $3.5 million in marital assets and that Laura dissipated $146,000 in marital assets, for a net total amount of dissipated assets of $3,354,000. Thus, each party's marital portion of dissipated assets equaled $1,677,000. The court ordered that $1,413,208.30 in Greg's 401K account be transferred to Laura as payment for Laura's marital portion of the dissipated assets. And in order to offset any potential "accounting gray areas" in which funds may have been spent for a marital purpose, the court declined to order an equalization payment from Greg to Laura of the remaining $263,791.70. Given the foregoing, we find no error in the district court's reliance on Laura's evidence rather than Greg's.

Greg also asserts that the district court erred in its calculation of the amount of cash he provided to Julia, arguing that the evidence shows he provided her with amounts ranging from $20 to $4,000 per month, rather than the $6,000 per month figure calculated by the district court. This argument is consistent with Greg's testimony at trial. However, Laura testified that Greg told her that when he would withdraw $9,000 in cash per month, he would give $6,000 to Julia and keep the remaining $3,000 in cash for himself. Again, we give weight to the district court's assessment of the credibility of the evidence and find no error in its reliance on Laura's testimony rather than Greg's.

Greg additionally claims that his exhibit detailing the expenditures from the 9779 account includes some transactions which he was unable to identify and that therefore, Laura failed to meet her burden of proving that those expenditures were for a nonmarital purpose. Greg, himself, admitted that he opened the 9779 account without Laura's knowledge in order to hide purchases from her and that a significant portion of

the purchases related to his affair with Julia. Thus, the district court did not abuse its discretion in finding that this evidence was sufficient to meet Laura's burden of proving by a preponderance of the evidence that the unidentified expenditures were also for Julia.

Similarly, Greg points to a total of $564,510.62 depicted on one of his exhibits which he identified at trial as not related to dissipation. And he also correctly observes that the district court miscalculated the amount of total cash dissipated; the total when multiplying $6,000 per month by 46 months equals $276,000, rather than the $296,000 total the district court calculated. Using these adjusted numbers, Greg calculates the amount of total dissipated assets as $2,489,661.57, rather than the $3.5 million calculated by the district court.

[12,13] When marital assets are dissipated by a spouse for purposes unrelated to the marriage, the remedy is to include the dissipated assets in the marital estate in dissolution actions. See *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009). As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

The district court determined that the total net amount of dissipated marital assets was $3,354,000. Even if we accept Greg's adjusted total of dissipated assets of $2,489,661.57 and subtract the $146,000 for Laura's dissipation, we are left with a net total of $2,343,661.57 in dissipated assets. Laura's award of the $1,413,208.30 in Greg's 401K represents approximately 60 percent of the total dissipated assets, which remains within the general rule that each spouse receive approximately one-third to one-half of the marital estate. For these reasons, we conclude that the district court did not abuse its discretion in its calculation of the dissipated marital assets.

### 3. Alimony

[14] On appeal, Greg challenges certain aspects of the district court's alimony award. In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id*.

[15,16] The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id*. The ultimate criterion is one of reasonableness. *Id*. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id*.

### (a) Calculation of Income and Ability to Pay

Greg first argues that the district court abused its discretion in its alimony award by improperly calculating his income and ability to pay. He claims that based on these erroneous calculations, the alimony award was in excess of his ability to pay and drives his net income below the poverty threshold set forth in the Nebraska Child Support Guidelines.

[17] In a case involving minor children, the amount of alimony must not force the obligor's net income below the poverty line unless the court specifically finds that such an

award is warranted. See *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). The Nebraska Child Support Guidelines do not apply, however, where the parties do not have any minor children to support. See *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015). The child support guidelines require courts to make a detailed calculation of the parties' income and expenses, but in *Binder*, the Supreme Court stated that it was wary of grafting the guidelines' method of calculating net income onto cases involving only alimony and reiterated that there is no mathematical formula by which alimony awards can be precisely determined. See *id*.

In the present case, although the district court calculated and ordered child support for the parties' younger child, that child has now reached the age of majority and Greg is no longer required to pay child support. Thus, this case involves only the payment of alimony, and there is no specific method by which to calculate the parties' incomes for alimony purposes.

The district court calculated Greg's monthly income by using an annual salary of $174,874, as reported on his recent tax return, and dividing that into monthly income of $14,572.83. The court also added $28,000 per month, which is the amount of monthly rent for the New York condominium, because the parties' accountant testified that he considered that amount to be income attributable to Greg, for a total income of $42,572.83 per month. Greg argues that the district court's inclusion of the New York condominium rent was erroneous because the condominium had been sold by the time trial was held and his monthly income is limited to the $14,572 he earns from SEI.

When looking at the parties' financial picture as a whole, we find no abuse of discretion in the district court's conclusion that Greg had the ability to pay $7,500 per month in alimony. It is undisputed that Greg generally earns an annual salary of approximately $200,000 per year from SEI. According to the parties' tax returns, their adjusted gross income in 2013 was $2,318,772; in 2014, it was $1,246,009;

in 2015, it was $11,360,171; and in 2016, it was $1,961,952. Laura stopped earning income when the parties' younger child was born, and thus, these earnings are all attributable to Greg and the parties' businesses and investments. Although Greg correctly points out that the New York condominium had been sold before trial began, the parties' accountant agreed that the amount of rent should be considered part of Greg's income. And it is clear from the record that Greg has additional funds at his disposal beyond his salary from SEI, even after the parties separated and Greg was paying temporary alimony and child support to Laura.

For example, in September 2017, Greg made a $50,000 payment on his 9779 account, which both he and Julia continued to use for personal expenditures throughout 2016 and 2017. He also made a $50,000 payment on the account in December 2017. For each month from January through August 2017, Greg made a payment toward Julia's separate credit card for amounts between $3,750 and $7,500 per month. According to Greg's own evidence, he spent $127,752.83 on Julia between August 28, 2016, and October 5, 2017. And on a personal financial statement Greg completed in April 2017, he indicated that he had various credit cards that he paid off monthly at a total of $78,000. We therefore reject Greg's argument that the amount of alimony awarded exceeded his ability to pay.

### (b) Excessive Alimony

Greg also claims that the alimony awarded in this case was excessive when considering the property awarded to Laura and ignores the primary purpose of an alimony award in Nebraska—to provide for an economically disadvantaged spouse for enough time to become self-sufficient. We find no abuse of discretion in the alimony award.

[18] The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately. *Brozek v. Brozek*, 292

Neb. 681, 874 N.W.2d 17 (2016). The purpose of a property division is to distribute the marital assets equitably between the parties. *Id*. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in § 42-365 make it appropriate. *Brozek v. Brozek, supra*. We therefore consider the alimony award separate from the marital property awarded to each party.

When considering the alimony factors set forth above, we observe that the parties were married for more than 30 years and raised two children together. After their second child was born, Laura forewent her career and stayed home to raise the children. She later worked for SEI during the marriage, but was not paid for her work. Laura currently has an active dietician license, and the court found that her earning capacity was approximately $40,000 per year.

[19] Alimony should not be used to equalize the incomes of the parties or punish one of the parties, but disparity in income or potential income may partially justify an award of alimony. See *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004). In *Kelly v. Kelly*, 246 Neb. 55, 65, 516 N.W.2d 612, 618 (1994), the Supreme Court addressed an alimony award where there was a disparity between the parties' incomes, stating:

> It is important to recognize that although the wife is fortunate enough to be able to reenter her career, her income potential is approximately a third of that of the husband. The district court's alimony award tends to even out that disparity and provides the wife with the means to partially recapture the standard of living that she and the husband jointly put together during their 19 years of marriage. Under the circumstances, the district court's award cannot be said to have constituted an abuse of discretion.

Likewise, here, although Laura has the potential to reenter the workforce and earn a living, her earning potential is

significantly less than Greg's. In fact, according to the district court's income calculations, Greg earns more per month than Laura could potentially earn in 1 year. Moreover, the parties had a long-term marriage, during which they enjoyed a certain standard of living. As in *Kelly v. Kelly, supra*, the alimony awarded to Laura will allow her to partially recapture that standard of living, while assisting her in maintaining marital property awarded to her such as the marital home. When considering the factors related to an alimony award, we conclude that the district court's alimony award was not an abuse of discretion.

### (c) Alimony Security

Greg contends that the district court erred in awarding Laura a security interest in Greg's real estate and stock in SEI and AEA to provide security for the monetary obligations he owes to Laura. We conclude that the district court did not abuse its discretion in this respect.

[20,21] A court has discretion to require reasonable security for an obligor's current or delinquent support obligations when compelling circumstances require it. *Davis v. Davis*, 275 Neb. 944, 750 N.W.2d 696 (2008). An order requiring security to be given is a somewhat extraordinary and drastic remedy, and therefore, reasonable security for payment of alimony, child support, or monetary judgments should only be invoked when compelling circumstances require it. See *Lacey v. Lacey*, 215 Neb. 162, 337 N.W.2d 740 (1983).

In *Brockman v. Brockman*, 264 Neb. 106, 646 N.W.2d 594 (2002), the Supreme Court considered whether the trial court abused its discretion in ordering a husband to set aside part of a workers' compensation award as security for his child support obligation. The evidence presented at the dissolution trial reflected that the husband had ceased employment after settling a workers' compensation case and had spent approximately $24,000 within 1 month of receiving around $62,000 in settlement proceeds. Thus, given the possibility that the

husband would exhaust the settlement proceeds and then be unwilling or unable to pay his child support, the Supreme Court concluded that the trial court did not abuse its discretion in ordering the husband to set aside a portion of the settlement proceeds as security for his child support obligation.

Similarly, the record in this case reflects that although Greg has substantial assets at his disposal, he continued spending money at a high rate during the pendency of the dissolution proceedings, including on Julia and other discretionary expenses. As noted above, he conceded that he spent more than $127,000 solely on Julia between August 2016 and October 2017. Given that Greg was ordered to pay to Laura $7,500 per month in alimony for 120 months and an equalization payment of $8,670.52 per month for 192 months, the record supports a possibility that Greg could become unable to satisfy these obligations in the future. Accordingly, the district court did not abuse its discretion in awarding Laura a security interest to secure Greg's obligations to her.

### 4. Postdecree Order

Greg assigns that the district court's postdecree order is unauthorized by statute and constitutes an abuse of discretion. We find that we do not have jurisdiction over this order, because it was entered after the notice of appeal was filed.

Greg filed his notice of appeal on April 26, 2018, appealing from the "Amended Decree of Dissolution of Marriage entered March 30, 2018." On May 1, Laura filed a motion for support pending appeal pursuant to Neb. Rev. Stat. § 42-351(2) (Reissue 2016). She sought spousal support, child support, and either the monthly mortgage payment and real estate taxes on the marital home or the monthly equalization payment as ordered by the court in its amended decree. Following a hearing, the district court entered an order granting Laura spousal support pending appeal in the amount of $7,500 per month, child support in the amount of $1,998 per month until the minor child reached the age of majority, and a monthly

payment of $8,670.52 as ordered in the amended decree. No notice of appeal was filed following this order.

Section 42-351(2) provides that the trial court shall retain jurisdiction of domestic relations actions during an appeal for purposes of entering orders "regarding support, custody, parenting time, visitation, or other access, orders shown to be necessary to allow the use of property or to prevent the irreparable harm to or loss of property during the pendency of such appeal, or other appropriate orders in aid of the appeal process." We recognize that the Supreme Court has reviewed postdecree orders on appeal. See, e.g., *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016); *Jessen v. Jessen*, 259 Neb. 644, 611 N.W.2d 834 (2000); *Olson v. Olson*, 195 Neb. 8, 236 N.W.2d 618 (1975). However, in *Jessen v. Jessen, supra*, and *Olson v. Olson, supra*, the postdecree orders were filed prior to the notice of appeal being filed. And in *Brozek v. Brozek, supra*, although the postdecree order was entered after the notice of appeal was filed, the appellant filed a separate notice of appeal after the postdecree order was entered and sought consolidation of the two appeals.

Neb. Rev. Stat. § 25-1912 (Supp. 2017) requires that a notice of appeal be filed within 30 days of the "judgment, decree, or final order." Section 25-1912(2) provides for relation forward of a notice of appeal or docket fee only when it is filed or deposited after the announcement of a decision or final order, but before entry of the judgment. Here, there was no announcement of a decision or final order on the postdecree motion prior to the filing of the notice of appeal; therefore, the original notice of appeal does not encompass the postdecree order. Because Greg has not properly appealed from this postdecree order, we lack jurisdiction to address an assignment of error relating to it.

### 5. Appreciation of Laura's Inherited Funds

On cross-appeal, Laura asserts that the district court abused its discretion in treating the appreciation of her nonmarital

stock as a marital asset. She argues that there were no active efforts taken in managing the stock, but, rather, the appreciation was passive because it was due to market forces and not any substantial effort from her or Greg.

Greg claims that Laura failed to properly cross-appeal and that we are therefore limited to a review for plain error. Greg correctly notes that the rules of appellate practice mandate the manner in which a party may raise a cross-appeal. See Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2014). Section 2-109 provides that a brief on cross-appeal must be structured as an appellant's brief and include, among other things, a separate section for assignments of error. If a party's brief does not include a separate section for assignments of error, an appellate court may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error. See *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014).

Here, Laura's initial brief failed to specifically assign any errors on cross-appeal. However, she sought and received this court's permission to file a replacement brief. Her replacement brief complies with all of the requirements of § 2-109, including a specific assignments of error section. Because her replacement brief replaces her original brief and complies with the rules, she has properly asserted a cross-appeal, and we therefore proceed to address the error raised in her brief.

[22] The question before us is whether the district court abused its discretion in treating the appreciation of stock purchased using Laura's nonmarital funds as a marital asset. Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves that (1) the growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse. See *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017).

The Supreme Court addressed a similar issue in *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). There, the

question was whether the increase in value of the premarital portion of a retirement account should be considered as part of the marital estate. In order to determine what portion of the retirement account was nonmarital property, the Supreme Court examined to what extent the appreciation in the separate premarital portion of the retirement account was caused by the efforts of either spouse. The court recognized that in that context, it had previously held that where appreciation of a wife's separate asset was due principally to inflation and market forces and not to any "'significant efforts'" by the husband, the appreciation should not have been included in the marital estate. *Id*. at 383, 866 N.W.2d at 78, citing *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982).

Likewise, the court in *Coufal* noted that in *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988), it had held that certain shares of stock should not have been included in the marital estate, because the parties were married 3 years after the husband began receiving stock; neither spouse contributed money to acquire the stock; the wife did not contribute to the improvement or operation of the stock, nor significantly care for the property during the marriage; and the stock was readily identifiable and traceable to the husband. The Supreme Court commented that in these decisions, some level of indirect or direct effort was required by the nontitled spouse—not just inflation or market forces—in order to include the increase in value in the marital estate. *Coufal v. Coufal, supra*.

The Supreme Court in *Coufal* also recognized that other courts have reached similar conclusions, including in *Baker v. Baker*, 753 N.W.2d 644 (Minn. 2008), where the Minnesota Supreme Court held that where a husband did not devote significant effort to managing his retirement funds and no significant effort was diverted from the marriage to generate the increase in the account, the appreciation in the nonmarital portion of the funds remained separate property. The court in *Baker* noted that in determining whether the appreciation in

the value of a nonmarital investment is marital or nonmarital, it looks to whether or not the appreciation is the result of active management of the investment, classifying active appreciation as marital property and passive appreciation as nonmarital property. There, the activity of the husband with respect to the accounts consisted of selecting and occasionally changing investment advisors; authorizing money managers to make discretionary decisions about the investments; retaining discretion to direct investments but exercising that discretion on only one occasion; and declining to withdraw from the funds although they were available as liquid assets. The court in *Baker* posed the question as to how else the husband could have invested his premarital retirement funds so as to ensure that their appreciation during the marriage would remain nonmarital before concluding that based on the record before it, the husband's role in the investments was insufficient to render active the appreciation in the value of the overall portfolio.

[23] Ultimately, the Supreme Court, in *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015), held that the appreciation was nonmarital, because it was not caused by the direct or indirect efforts of either spouse. More recently, the Supreme Court observed that other jurisdictions have reached a remarkable degree of consensus that appreciation or income of separate property is marital property to the extent that it was caused by marital funds or marital efforts. See *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017). The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of the appreciation or income. *Id*. Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property in the first instance. *Id*. In contrast, passive appreciation is appreciation caused by separate contributions and nonmarital forces. *Id*. And most states, by statute or case law, define marital contribution broadly to include the efforts of either the owning or the nonowning spouse. *Id*.

In the present case, Laura received her first inheritance from her mother in 2011. She initially placed the inherited stocks and cash in a TD Ameritrade account, but later in 2011, she decided to buy different stock and transfer funds into a mutual fund. She subsequently inherited an additional sum and deposited it into the mutual fund. We do not find these one-time transfers that Laura made during the 6-year period from the time of inheritance until the time of trial to constitute active efforts sufficient to render the appreciation in value a marital asset. Similar to the question posed by the Minnesota Supreme Court, our concluding that Laura's actions constitute active efforts would lead to the question of how a spouse could ever invest inherited funds so as to ensure that their appreciation during the marriage would remain nonmarital. Accordingly, we hold that the district court abused its discretion in classifying the appreciation of Laura's nonmarital funds as a marital asset.

The district court determined that there was $291,407.41 in active appreciation in stocks and $225,820.88 in active appreciation in the mutual fund. There was an additional $172,631.95 of securities and cash transferred into Laura's TD Ameritrade account, but Laura was unable to adequately explain the source of these funds. The district court thus concluded that Laura failed to meet her burden of proving that these funds were separate property. Accordingly, the court classified the sum of all of these amounts, $689,860.24, as marital property and awarded Greg 50 percent of the value for a total of $344,930.12.

Our conclusion mandates only that the active appreciation of the stocks and mutual fund is excluded from the marital estate, but that the $172,631.95 in funds from unknown sources remains classified as marital property. We therefore modify the amended decree to award Greg half of the marital portion of these assets, or $86,315.97.

This modification also necessitates a modification to the equalization payment due from Greg to Laura. We note a

small typographical error in the district court's final equalization payment: the court ordered Greg to pay a rounded total of $1,664,741 to Laura, but according to the court's calculations, the correct total should be $1,664,714.05, rounded to $1,664,714. When modifying the marital portion of Laura's inheritance as explained above, the total equalization payment due from Greg to Laura becomes $1,923,328.20. Dividing that amount by 192 months as the district court did results in a monthly payment owed from Greg to Laura of $10,017.33. The amended decree is therefore modified to reflect these figures.

## VI. CONCLUSION

As discussed above, we conclude that the district court abused its discretion in finding that the appreciation on Laura's inherited funds was marital property, and we modify the amended decree as explained above. We otherwise affirm.

AFFIRMED AS MODIFIED.