IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

COPPERSMITH V. COPPERSMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LARRY WAYNE COPPERSMITH, APPELLANT,

V.

KRISTINE KAY COPPERSMITH, APPELLEE.

Filed July 15, 2025.    No. A-24-347.

Appeal from the District Court for Keith County: MICHAEL E. PICCOLO, Judge. Affirmed as modified.

Bradley D. Holbrook, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellant.

Peter C. Wegman and Abbie L. DeWitte, of Rembolt Ludtke, L.L.P., for appellee.

MOORE, PIRTLE, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Larry Wayne Coppersmith appeals the Keith County District Court's order dissolving his marriage to Kristine Kay Coppersmith. He assigns error related to the court's valuation date and valuation of certain property, classification of assets as marital property, division of certain assets and debts, determination that Larry dissipated marital assets, calculation of an equalization payment, consideration of certain expert testimony, determination of income for purposes of child support, and award of alimony. For the reasons set forth herein, we affirm as modified.

## II. STATEMENT OF FACTS

### 1. BACKGROUND OF PARTIES

Larry grew up in Perkins County, Nebraska. Both before and during the parties' marriage, Larry was actively and consistently engaged in farming. Larry farmed and managed his parents'

- 1 -

farm which was incorporated under the name Coppersmith Farms, Inc. (CFI). Larry also farmed under his own entity, LRC Inc. (LRC).

Larry was married previously and during his first marriage, he and his wife had a son and a daughter before divorcing. Larry's son from his first marriage, Andy, has helped Larry run the family farming operation since 2010.

Before meeting Larry, Kristine obtained bachelor's degrees in psychology and nursing. She worked as a nurse in Pennsylvania until 2001 when she returned to Nebraska to care for her mother after her father passed away. After moving back to Nebraska, Kristine was employed full time as a nurse at a hospital but left about a year later to spend about 10 weeks caring for her sister who had been injured in a car crash. Kristine then worked as a traveling nurse. However, after meeting Larry and becoming engaged in November 2001, Kristine left her job the following month.

## 2. MARRIAGE

Larry and Kristine were married in July 2002. After their marriage, Kristine moved into Larry's home in Wallace, Nebraska (Wallace Home). The Wallace Home was located on a 45.37 acre homestead which included other bins and buildings. At that time, Larry's two children from his prior marriage still lived at Larry's home. Although Larry's daughter left for college about 2 weeks after Larry and Kristine's marriage, Larry's son, Andy, remained in the home for several years while he finished high school.

During this time, Kristine worked part-time at a nursing home until Larry opened a fertilizer company in approximately March 2004. At that time, the parties agreed that Kristine would provide bookkeeping services for the fertilizer business and help with the harvest.

In the fall of 2004, Kristine's nursing license was up for renewal. When Kristine discussed renewing her license with Larry, he told her not to renew her license because she was never going to use her nursing license again.

In August 2006, Larry and Kristine had twins, Eden Elizabeth Coppersmith and Noah Davis Coppersmith. Eden was born with spina bifida and required regular medical interventions and 24-hour assistance. Kristine testified that she had been the children's primary caregiver, and she took care of the home while Larry worked. Larry testified that it "was a given" that Kristine would stay home and take care of the children.

In April 2009, Kristine's mother, who was suffering from dementia, moved into the Wallace Home so that Kristine could provide care for her. After Kristine's mother moved into the Wallace Home, the parties, with the financial assistance of Kristine's family who provided $135,000, added a mother-in-law suite to the Wallace Home. Kristine testified that her mother passed away in March 2018. According to Kristine, during that time, Larry informed her that he believed that they were having issues in their marriage.

## 3. PURCHASE OF PAXTON HOME AND PAXTON "PIT STOP"

In 2019, after Eden experienced bullying at school, Larry and Kristine decided that it was in their children's best interests to attend the Paxton School District. To effectuate this decision, they purchased a home in Paxton, Nebraska (Paxton Home). During the week, Kristine and the children stayed at the Paxton Home and, on the weekends, returned to the Wallace Home, which

was approximately 20 miles away. During the pendency of the case, Larry resided at the Wallace Home and Kristine resided at the Paxton Home. For several years, both children resided in Paxton with Kristine; however, in August 2022, Noah moved in with Larry in the Wallace Home.

The Paxton Home was financed 100 percent through Farm Credit Services of America (FCSA) and the loan was secured with real estate owned by LRC.

Also in 2019, the parties purchased a convenience store in Paxton called the "Pit Stop." Larry and Kristine purchased the Pit Stop because Larry was interested in owning a convenience store and as a way to add value to the Paxton community. Although both parties participated in the business, neither party received a salary.

### 4. COMPLAINT FOR DISSOLUTION

In November 2021, Larry filed a complaint for dissolution of his marriage to Kristine praying that the court: fairly and equitably divide the parties' assets and debts; award the parties joint legal and physical custody of their minor children; and grant such further relief as it deemed just and equitable. Kristine filed an answer and counterclaim requesting that the court dissolve the parties' marriage; equitably divide the parties' property and debts; award her legal and physical custody of the parties' minor children; award her child support and alimony; restrain Larry from disposing of marital assets; and grant other relief the court deemed just and equitable.

### 5. APRIL 2023 TEMPORARY ORDER

In April 2023, the court entered a temporary order based upon the parties' joint stipulation which provided that the parties would share joint legal custody of Eden and Noah; that Larry would have temporary physical custody of Noah; that Kristine would have temporary physical custody of Eden; and that, commencing May 1, 2023, Larry would pay Kristine temporary child support of $1,000 per month. The order also provided, in pertinent part:

3. In lieu of an order for temporary spousal support and expert and attorney fees, [Kristine] shall receive the net cash proceeds from the sale of the Pit Stop with the exception of $14,517.77 that [Larry's] counsel shall hold in trust to pay the annual Pit Stop FCSA payment due [on] July 1, 2023. [Kristine] shall receive the monthly payments from the contract on the Pit Stop during the pendency of this action. The issues regarding how the Pit Stop proceeds are to be allocated between temporary alimony, attorney and expert fees[,] and property division shall be reserved for the trial herein.

4. [Larry] will continue to pay the $771 in health insurance, $621.45 for the Paxton mortgage, $205.31 for the Paxton property taxes, $157.58 for the Paxton home insurance, $87.15 for [Kristine's] car insurance, $37.06 for [Kristine's] vehicle licensing, and $83.46 for the minor children's cell phone plans.

### 6. TRIAL

The trial in this matter was held over 4 days in November 2023 and March 2024. At the start of the trial, the parties stipulated that they would share joint legal custody of the minor children with primary physical custody of Eden with Kristine and, following the trial, the district court awarded Larry primary physical custody of Noah. Because neither party has raised any issues

on appeal relating to custody of the minor children, any discussion relating to issues surrounding custody will be minimal and only discussed if necessary for resolution of other issues. As relevant to this appeal, the trial court heard evidence regarding when the parties' separation occurred; the proper date to value the parties' property and debts for the purposes of division; the property and debts to be divided including the parties' interests in three farming operations referred to as CFI, LRC, and Law Family Partnership (Law Family); Larry's predissolution gift of 49 percent of LRC to his son, Andy; Larry's predissolution lease of certain farm equipment to Andy; certain acquisitions made during the marriage that impacted premarital property; evidence governing the appreciation of certain premarital property; evidence governing the purchase and sale of the Pit Stop; and evidence of Larry and Kristine's incomes as it related to the prayers for child support and alimony. We summarize that evidence below.

### (a) Parties' Separation as Related to Valuation Date

Larry testified that he was unsure about the date when the parties' marriage began to deteriorate, but that he believed it was sometime in 2020. However, he acknowledged that he first informed Kristine of issues in their marriage in March 2018. Larry also testified that after the parties purchased the Paxton Home in 2019, the parties lived in both homes until their separation. Larry filed his complaint for dissolution in November 2021, and Kristine filed her answer and counterclaim in December 2021. As such, Larry requested that the court generally utilize January 2022 as the valuation date, which he argues fairly equates to the date the parties were separated as a couple, as evidenced by his filing for divorce and the parties' living arrangements.

Kristine testified that her mother passed away in March 2018, and during that time, Larry informed her that he believed that they were having issues in their marriage. From that date, Kristine argued that Larry engaged in significant marital dissolution planning, including gifting away nearly half of his farm interest, and she argued she received minimal support from Larry thereafter and that fairness and equity required that the valuation take place on the date of trial, which began on November 1, 2023.

### (b) Property of Parties at Issue

#### (i) CFI

Larry testified that CFI is a family farming business initially incorporated by Larry's parents in 1980. In 1996, Larry's parents issued partial interests in CFI to Larry and his three siblings even though Larry's siblings were not involved in the farming operation. By the time of Larry's marriage to Kristine in 2002, Larry owned 64 shares of the total of 572 outstanding shares of CFI. In addition to farming LRC, Larry farmed CFI's land and received a salary for his work. At the time Larry's father passed away in 2014, CFI was owned by Larry's mother, Larry, and Larry's three siblings, who owned their interests either individually or through trusts.

In April 2017, Larry and his son Andy acquired all outstanding shares of CFI from Larry's family. These acquisitions were accomplished through direct purchases and corporate redemptions. More specifically, Larry purchased his mother's four shares; Andy purchased 142 shares from Larry's siblings; and the remaining 284 shares were redeemed by CFI. In connection with the redemptions, CFI paid a total of $50,000 in cash related to its purchase of CFI shares from Larry's siblings and issued promissory notes to Larry's siblings in a total combined amount of

$2,000,000 payable in installments over 20 years. Following these transactions, Larry and Andy were the sole owners of CFI, with Larry owning 146 shares and Andy owning 142 shares.

In April 2022, Larry and Andy completed a corporate reorganization and spin-off of CFI. Pursuant to the transaction, Larry acquired Andy's 142 shares in CFI and, in exchange, CFI transferred to Andy 5 quarters of pivot-irrigated land and certain debts of CFI including some of the redemption notes. Allen Fugate, the lawyer who assisted with the spin-off testified that the spin-off and reorganization was fair to both Larry and Andy.

### (ii) LRC

In 1989, Larry incorporated LRC and transferred all of his farming assets into that entity. At the time of Larry's marriage to Kristine in 2002, Larry owned 100 percent of LRC. At that time, LRC owned 6 parcels of land and the "homeplace" which consisted of the Wallace Home, bins, and buildings sitting on approximately 45 acres.

Sometime between 2005 and 2006, LRC purchased 40 acres formerly owned by CFI. The acquisition was made to avoid later estate issues associated with a pivot owned by LRC running onto 40 acres of land owned by CFI. LRC paid $16,000 to acquire that parcel and was paid with cash from LRC.

LRC purchased an additional quarter of land in 2012 for $736,000. The purchase was financed through FCSA. The quarter was appraised at $844,000 as of 2023, and Larry acknowledged that this quarter of land was a marital asset. He also explained that the associated debt to acquire that quarter of land was combined into a single note through FCSA.

Larry acknowledged that the Wallace Home is owned by LRC and that he lived in the home located on that property since 1985. Larry acknowledged that at the time the parties married in 2002, the Wallace homeplace was valued at $85,000 and that, at the time of trial, it was valued at $750,000 due to improvements that had been made to the homeplace during the marriage, including the addition of the mother-in-law suite.

Larry testified that very little had changed about the operation of either LRC or CFI during the parties' marriage, but acknowledged that five new pivots had been purchased for LRC or CFI; two new bins had been added to the homeplace; an additional two bins were added to other quarters; four fertilizer tanks had been purchased and added to the homeplace; a grain-drying facility was added; multiple shop building repairs had been made; and the parties had made at least $480,000 in improvements to the Wallace homeplace.

### (iii) Law Farms

Law Farms is a partnership owned by Kristine's family which owns 8 quarters of farmland. In March 2018, following the death of her mother, Kristine inherited a ⅙ interest in Law Farms. At that time, Law Farms was valued by the estate at $3,491,836. However, on December 21, 2021, a farm loan application/agricultural financial statement of Law Farms indicated it was valued at $7,111,065. Kristine generally receives approximately $24,000 in annual distributions from Law Farms.

Larry testified that he had farmed some of Law Farms' land, which is located in the middle of land owned by LRC, CFI, and land owned by Andy, during the entire duration of their marriage. He testified that he used the same farming methods on Law Farms' land that he used on LRC's

and CFI's land and that, although he did not believe that his farming practices resulted in any active appreciation of LRC's and CFI's land, if the court determined that the appreciation of LRC and CFI land was deemed to have actively appreciated due to his efforts during the marriage, then Kristine's share of Law Farms should be treated similarly.

### (c) Gifting of LRC Shares to Andy

Larry continued to own 100 percent of LRC until December 2018, when he allegedly gifted 49 percent of LRC to Andy. With the assistance of Fugate, Larry's corporate counsel, on December 31, 2018, Larry executed a stock certificate gifting 4,900 shares of LRC's common stock to Andy. Fugate testified that he and Larry discussed that the reason for the transfer was for business succession planning, issues related to the CFI redemption transaction with his siblings, and Andy's desire to increase his farming operations. Larry acknowledged that he did not discuss the transfer to Andy with Kristine prior to its execution. Following the transfer, Larry continued to represent on LRC's balance sheets and tax returns that he owned 100 percent of LRC and dividends available for the years 2019, 2020, and 2021 were paid 100 percent to Larry.

Jacob Haskell, an agricultural loan officer for FCSA, testified that he had been the loan officer for Larry's loans for approximately a year and a half and that FCSA provided Larry a line of credit for his farming operations. Haskell testified that he was not made aware that Larry transferred 49 percent of common stock of LRC to Andy and that it was his impression that Larry was a 100 percent owner of the entities.

Kristine argued that Larry's stock transfer to Andy should be identified and treated as a dissipation of the marital estate and proposed that the value of LRC's property should be 100 percent attributed to Larry as of the valuation date for purposes of equitable division.

### (d) Farm Machinery and Equipment Lease

In September 2021, Larry entered into a contract leasing LRC's equipment and machinery to Andy for $100,000 per year for 10 years with the option to purchase the machinery and equipment at the end of the lease for $90,000. The lease amount was based on an August 2, 2021, equipment appraisal that assessed the equipment and machinery as having a fair market value of $886,750. The lease payments go to LRC which are then apparently used to pay its debt obligations. After this lease, only limited equipment remained on LRC's books.

Larry testified that LRC's machinery and equipment was of the same or similar quantity and nature prior to his marriage up to January 2022, but that it was not the same equipment, because over the years LRC has continued to trade older equipment for newer equipment as necessary and the new equipment and machinery was more expensive. Larry admitted that he could not trace proceeds from the 2002 equipment to the existing equipment and that, at the time he entered into the lease with Andy, he knew that he was going to file for divorce and actually filed approximately 6 weeks later.

Kristine's expert, CPA James Oltman, testified that, as of January 1, 2023, the present value of the $800,000 in remaining payments in the lease agreement with Andy was $768,103.49, including the $90,000 lease purchase option. Oltman's present value calculation did not include the $200,000 in payments that Larry had received in January 2022 and January 2023.

Fugate testified that that transfer of shares and the machinery and equipment lease "were arms-length transactions that are usual and customary in farming for a father and son working towards succession of that farming operation so that it continues to be successful over time." He further testified that there were legitimate business reasons for the transactions.

### (e) Appreciation of Premarital Real Estate

Larry testified that he did not believe that any increase in the value of either LRC or CFI land during the marriage was due to active appreciation. He retained Robert T. Marland, Jr., to testify on the issue of active versus passive appreciation of land in the Lincoln County and Perkins County areas.

### (i) Marland Testimony

Marland testified regarding his extensive experience relating to agricultural land. He testified that he had nearly 50 years of experience in valuing agriculture-related areas including ranch management, agricultural loan lending, and agricultural real estate appraisal. Marland testified that he looked at the period of February 2002 to February 2023 regarding center pivot irrigated land in the southwest district of Nebraska, including Perkins County, to determine a net passive increase in value of the land. Utilizing an annual report published by the University of Nebraska-Lincoln, Marland opined that the net passive increase in land value in the southwest district of Nebraska was 8.69 percent which equated to a net passive increase of $3,733 per acre. He explained that the term "passive" means that the increase is not based upon an individual; instead, its "based upon an area of many, many farmers and many, many buyers and sellers. It's a composite. It's an objective composite of comparable sales." Marland further opined that 100 percent of the increase in the value of agricultural ground in that area is passive appreciation and that a producer has very little impact on the increase in value of agricultural real estate. However, he did admit that Larry's efforts in managing and farming the LRC and CFI's ground for the past 20 years was "a contributing factor" in the land appreciating in value.

### (ii) Oltman Testimony

Kristine hired James E. Oltman to testify on several issues. First, Oltman testified that the present value of the remaining lease payments of the machinery lease agreement between Andy and Larry as of January 1, 2023, was $768,103.49. Next, Oltman calculated the approximate annual after-tax income paid to Larry including incomes from LRC and CFI. In Oltman's opinion, Larry's annual net income for child support and alimony purposes was $267,000.

Finally, Oltman calculated the increase in LRC and CFI real estate during the parties' marriage. Oltman determined that for a center pivot irrigated plot of land, the 2002 value was $1,167 per acre and the 2023 value was $5,475 per acre. Based upon these values, Oltman calculated that the total value increase on CFI's balance sheets for the 20-year period was $2,880,000. For LRC, Oltman employed a similar analysis but used the 2001 balance sheet coming up with marital appreciation amount of $3,736,090. Oltman utilized Marland's calculation of passive appreciation of real estate to opine that the excess appreciation beyond passive appreciation of CFI's farm ground was $601,320 and LRC's farm ground was $501,248.

### (f) Paxton Pit Stop

In 2019, the parties purchased the "Pit Stop," which was a convenience store in Paxton. The Pit Stop was purchased for $135,000 and was financed by LRC through FCSA. The Pit Stop was titled in a separate LLC of which Kristine was listed as the sole owner.

Although the Pit Stop was held in a separate entity in which Kristine was the sole owner, both parties participated in the business with Kristine managing the Pit Stop while Larry dealt with the vendors, fuel, ammunition, liquor license, and maintenance. Neither party received a salary or compensation from the Pit Stop due to the business generally breaking even each year.

Throughout the duration of the parties' operation of the Pit Stop, the cash register's system would not balance. Both parties were aware of the issue and attempted to resolve the issue by talking with Pit Stop workers, consulting a cash register servicing company, and consulting certified public accountant (CPA) Ty Cox's office, but the issue remained unsolved.

Larry hired Cox, Larry's personal and corporate CPA, to do an evaluation of the daily cash register tapes versus the deposits. Based on a comparison from January 2021 to February 2023, Cox determined that there was $117,000 in unaccounted funds. Cox could not determine where the "missing funds" went and did not accuse Kristine of stealing any of the funds from the Pit Stop. Larry testified that he believed that the Pit Stop should have been profitable, but he has always believed that Kristine is an honest person.

The parties sold the Pit Stop in 2023 for $320,000. Of that amount, $200,000 was a cash payment and $120,000 was financed. Kristine testified that, after expenses, she received $103,000 in net proceeds from the sale which she retained pursuant to an agreement with Larry. Kristine testified that the majority of those funds were used to pay a portion of her attorney fees.

### (g) Parties' Incomes

#### (i) Kristine's Income

Kristine testified that her nursing license expired 20 years ago, and it would take her approximately 2 years to complete the education requirements necessary to renew her licenses, meaning she would be in her mid-sixties before she could resume employment as a nurse. Kristine further testified that due to difficulty in finding care for Eden during training, continuing education, and work hours, she has been unable to pursue the possibility of renewing her nursing license. She also testified that it was impractical for her to obtain employment due to Eden's medical condition and Eden's inability to live independently. Kristine's sole income is the approximately $24,000 annual distribution that she receives from Law Farms.

#### (ii) Larry's Income

Larry testified that he received a gross monthly salary of $3,500 from LRC and $1,000 from CFI. Additionally, Larry testified that LRC pays personal expenses including car payments, home insurance, health insurance, car insurance, car maintenance, family cell phones, internet, and other expenses. Additionally, LRC paid the mortgage on the Paxton Home, Kristine's car insurance and maintenance, her cell phone, and internet service.

Cox testified that he was asked to give an opinion regarding Larry's annual available income when considering Larry's personal tax returns, the entities' tax returns, and the

depreciation for the entities. Cox created an exhibit, which was received into evidence, that indicated Larry's compensation from LRC consisted of Larry's wages, a simple IRA plan, grocery reimbursement, life insurance premiums, health insurance premiums, medical expenses, mortgage payments for the Paxton house, payments for the Honda Pilot, interest, and dividends.

### 7. DISSOLUTION DECREE

In March 2024, the court entered the decree of dissolution in a thorough 51 page order with the following attachments: Addendum "A" – Property Division; Addendum "B" – Recapitulation and Equalization of Marital Estate; Addendum "C" – Parenting Plan; and Addendum "D" – Child Support Worksheet.

The court found that there was some dispute as to when the parties separated and as to the appropriate valuation date for the marital estate. The court noted that Larry wanted the court to use a January 1, 2022, valuation date, which was the date the parties were living separately, and Larry filed for divorce, whereas Kristine wanted the court to use a valuation date of November 1, 2023, which was the first day of trial. The court found that using November 1, 2023, as a general valuation date more rationally related to the diverse and complex composition of the marital assets.

The court valued the Wallace Home at $665,000, which the court derived by using Larry's valuation of the home and surrounding structures valued at $750,000 at the time of trial less Larry's premarital value of the home of $85,000.

The court found that the evidence supported Kristine's allegation that the marital estate was improperly dissipated by Larry's predissolution gift of LRC stock to Andy and subsequently valued the marital portion of LRC at 100 percent of its value. In valuing the assets and debts of LRC and CFI, the court valued all personal property as marital having determined that all such property had been replaced; included a calculated value for crop inventory; included the value of active appreciation of real estate; and included, as a marital asset, the reduction of certain premarital debt in both LRC and CFI. The court similarly included values for the Paxton residence and Pit Stop proceeds. Regarding the lease of certain personal property in LRC to Andy, the court found that the lease arrangement with Andy involving the machinery and equipment was another "attempt by Larry to dissipate marital assets" and included both the $200,000 in payments already received as well as $768,103.49 of the present value of the remaining lease payments as a marital asset. As it related to the current indebtedness of CFI and LRC, the court included only a portion of both entities' debt in its final allocation of marital interest.

The court acknowledged that pursuant to the parties' stipulated agreement, in addition to the net cash previously paid to Kristine of $103,828.96 from the sale of the Pit Stop, she was also entitled to the $120,000 balance of the purchase price.

As relevant to this appeal, we list the court's division of assets modified to present subtotals in areas where the parties have not alleged error:

|  | **LARRY** | **KRISTINE** |
| --- | --- | --- |
| A. Household Contents | $0 | $0 |
| B. Checking and Savings Accounts | $92,515.28 | $13,225 |
| C. Automobiles – 2019 Honda Pilot |  | $14,000 |
| D. Paxton Pit Stop Promissory Note |  | $120,000 |
| E. REAL ESTATE |  |  |

| | | |
|---|---|---|
| 1. Wallace Home and 45.37 acres of surrounding property | $665,000 | |
| 2. Paxton Home | | $150,000 |
| 3. Appreciation of 160 acres in Lincoln County (including pivot) | $108,000 | |
| 4. N 1/2 N l/2 SW l/4 35-12-35 -- 40 acres | $169,320 | |
| F. Life Insurance/Retirement Plans | $0 | $278,024.73 |
| G. Miscellaneous | | |
| 1. LRC Disputed Issues: | | |
|   a. Bank accounts | $383,857 | |
|   b. Buildings and equipment | $338,167 | |
|   c. Prepaid expenses | $385,242 | |
|   d. Madrid Ethanol Plant | $23,000 | |
|   e. Bins | $100,000 | |
|   f. Deferred Co-Op patronage | $50,000 | |
|   g. Vehicles (except Honda Pilot) | $48,839 | |
|   h. Cessna 182 airplane | $60,000 | |
|   i. Wallace hangar | $25,000 | |
|   j. 2023 crop inventory | $651,772 | |
| 2. Debt Reduction Issues: | | |
|   a. Adams Bank & Trust loans | $ 0 | |
|   b. FCSA loan | $353,070 | |
|   c. CFI land purchase/debt service | $ 0 | |
| 3. CFI Stock Purchase Debt Reduction: | | |
|   a. CFI stock purchase debt reduction | $110,623.82 | |
|   b. CFI additional debt reduction (Eugene) | $ 13,495.13 | |
|   c. Larry's purchase of Virginia's stock (4 shares) | $ 14,635.21 | |
|   d. Stock purchase downpayments | $ 25,345 | |

| | | |
|---|---|---|
| 4. LRC Machinery Lease, Payments and Retained: | | |
|   a. Machinery lease present value | $768,103.49 | |
|   b. Machinery lease payments made prior to trial | $200,000 | |
|   c. Machinery/equipment retained | $184,537 | |
| 5. CFI Farm Assets | | |
|   a. Current net assets | $788,366 | |
|   b. Machinery, equipment and other non-real-estate net assets | $121,012 | |
| Appreciation of Premarital Farm Ground: | | |
|   a. CFI | $601,320 | |
|   b. LRC | $501,248 | |
| **Total Assets** | **$6,782,578.93** | **$575,249.73** |

The court ordered Larry to pay monthly child support of $1,335 based upon its determination that Larry's gross monthly income, as depicted in Larry's exhibit 36, showed a combined gross monthly income of $28,015, while providing that the sum "more accurately represent[ed] the income reported by his accountant." The court further noted that this amount was "slightly less" than the amount proposed by Kristine's accountant.

In determining whether to award alimony to Kristine, the court considered that the parties were married for over 21 years; that Kristine was the primary caregiver to Andy, Eden, and Noah; that although Kristine has two bachelor's degrees, the parties agreed to allow Kristine's nursing license to lapse so that Kristine could perform bookkeeping for Larry's fertilizer business and help with the farming business; that Eden requires, and will continue to require, a great deal of medical care and parental assistance due to her medical issues; that the parties stipulated to a temporary child support arrangement for Larry to pay $1,000 per month in April 2023; and that the parties agreed to allow Kristine to retain the net cash proceeds from the sale of the Pit Stop but that almost half of the proceeds were utilized to fund the divorce litigation. The court further found that Kristine's current monthly income was limited to her annual distribution from Law Farms whereas Larry's cash flow potential, as represented by him, exceeded $28,000 per month. The court further found that Kristine was "reasonably likely" to incur monthly expenses of approximately $5,500. Based upon these considerations, the court ordered Larry to pay Kristine alimony of $2,800 per month for 18 months and $3,800 per month for 102 months through March 2033.

In equalizing the marital estate, the court calculated the following in its "Recapitulation and Equalization of Marital Estate" incorporated as Addendum "B" of the court's order:

| ASSETS | LARRY | KRISTINE |
|---|---|---|
| A. Household Goods | $0 | $0 |
| B. Checking Accounts | $92,515.28 | $13,255 |

| | | |
|---|---:|---:|
| C. Automobiles (2019 Honda Pilot) | $0 | $14,000 |
| D. Paxton Pit Stop Promissory Note | $0 | $120,000 |
| E. Real Estate | $942,320 | $150,000 |
| F. Insurance/Retirement Plans | $0 | $278,024.73 |
| G. Miscellaneous | $5,747,743.65 | $0.00 |
| **Total Assets ►** | **$6,782,578.93** | **$575,279.73** |

| | LARRY | KRISTINE |
|---|---:|---:|
| **Total Assets►** | $6,782,578.93 | $575,279.73 |
| **Total Debts►** | ($0) | ($0) |
| **Net Marital Estate ►** | $6,782,578.93 | $575,279.73 |
| Difference in Net Marital Estate ► | | $6,782,578.93 |
| | | ($ 575,279.73) |
| | | $6,207,299.20 |
| | | *Equalization: ($6,207,299.20/2 =* |
| | | *$3,103 649.60)* |
| Adjusted Net Marital Estate Equalization ► | $6,782,578.93 | $ 575,279.73 |
| | ($3,103,649.60) | $3,103,649.60 |
| | $3,678,929.33 | $3,678,929.33 |

We note that, pursuant to our calculations, the total assets awarded to Larry was $6,782,467.93, which is $111 less than the district court's calculation of $6,782,578.93, and the court awarded Kristine $13,255 for checking accounts, which was $30 more than the evidence reflecting that the amount of the checking account awarded to Kristine was $13,225. However, since these errors are inconsequential in relation to the overall value of the parties' marital estate and neither party has raised the issue of these slight miscalculations, we proceed to use the court's calculations in considering this appeal.

The court entered an equalization judgment in favor of Kristine in the amount of $3,103,649.60 drawing interest at the statutory rate of 7.264 percent to be paid in installment payments over the course of 10 years. The court further awarded Kristine $13,000 in attorney fees.

8. MOTION TO ALTER OR AMEND

On March 18, 2024, Kristine timely filed a motion to alter or amend the dissolution decree which requested that the court alter or amend paragraph 7 of the decree relating to the equalization judgment. The court granted Kristine's motion to amend the decree regarding the equalization judgment. Summarized, the court ordered Larry to pay the $3,103,649.60 equalization judgment in favor of Kristine over a 10-year period with interest accruing at the statutory rate or a rate that the parties otherwise agreed to in writing. Larry has timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

Larry's assignments of error, consolidated and restated, are that the district court erred in: (1) setting the valuation date as of the date of trial and then applying different valuation dates to certain assets; (2) omitting the Pit Stop proceeds; (3) improperly valuing the Wallace Home; (4) finding that Larry dissipated his LRC Stock; (5) committing errors related to present value of future lease payments and prior lease payments pursuant to the machinery and equipment loan; (6) awarding Larry $184,537 of machinery and equipment in LRC; (7) valuing assets of CFI and LRC without also considering CFI and LRC debt; (8) including active appreciation of LRC and CFI ground and double counting the increase in the 40 acres; (9) failing to consider Law Farms; (10) calculating the marital estate and equalization payment when it disregarded the testimony of Cox and Haskell; (11) determining Larry's income for child support and alimony; and (12) awarding alimony.

### IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024).

### V. ANALYSIS

Before addressing Larry's assignments of error, we first revisit the law related to the division of marital property.

In a marital dissolution action, the equitable division of property is a three-step process. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* And the third step is to calculate and divide the net marital estate equitably between the parties. *Id.*

As a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Anderson v. Anderson*, 27 Neb. App. 547, 934 N.W.2d 497 (2019). The burden of proof to show that property is nonmarital remains with the person making the claim. *Id.* Generally, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

### 1. VALUATION DATES

Larry's first assignment of error is that the district court erred in setting the valuation date of the parties' marital estate as November 1, 2023, which was the first day of the trial. He also

argues that "[f]urther compounding the valuation date error, the [district court] did not consistently use the date of trial for valuation purposes." Brief for appellant at 25. Kristine counters that the trial court did not abuse its discretion by using the trial date for valuing the majority of the marital estate or in selecting multiple valuation dates when reasonableness and fairness required the court to do so.

The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023). The date of valuation is reviewed for an abuse of the trial court's discretion. *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019). Larry's first argument is that the court abused its discretion in choosing the November 2023 trial date as the valuation date rather than his proposed January 2022 date, which was closer in time to the date he filed his complaint for dissolution. Larry requested the earlier date because he and Kristine were separated by then, and Larry sought to retain the fruits of his labor in continuing to farm after their separation.

But the trial court found that the November 2023 trial date provided a more equitable date to value the marital estate for purposes of division. In support of that finding, the court noted the minimal level of support Larry provided to Kristine during the pendency of the action and Larry's predissolution divorce "planning," which the court found provided equitable reasons to set the valuation date at the time of trial.

Here, the evidence demonstrated that during the period between the parties' separation and trial, Kristine provided exclusive care for Eden who required continuous care due to her medical condition. Further, Kristine's prior decision not to pursue her nursing career was due, in part, to her role in caring for Eden and which, to some extent, allowed Larry to continue to devote his time to managing the farming operations. When considered with the court's findings on Larry's predissolution divorce planning and the minimal contributions Larry provided to Kristine during the pendency of the case, we find no abuse of discretion in the court's setting of the valuation date as of November 2023, which allowed Kristine to share in the growth of the assets through that date. See *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021) (finding that valuing estate at date of trial was rationally related to marital property during period between separation and trial where wife provided almost exclusive care for the parties' minor children and, thus, at least to some extent, made husband's earnings possible).

Larry's second argument is that although the court chose November 2023 as the valuation date, the court failed to use that date to value all of the parties' assets. More specifically, Larry argues that the court used the "financial statement dated January 7, 2022 to value LRC bank accounts at $383,857 and LRC building and equipment at $338,167"; that LRC's prepaid expenses were calculated as an average between 2022 and 2023; that LRC's crop inventory was calculated as an average from 2016 to 2023; and that the value of the parties' retirement accounts were not valued at the chosen valuation date. Brief for appellant at 25.

Generally speaking, a district court has discretion to utilize multiple dates to fairly and reasonably divide the marital estate so long as the valuation date is rationally related to the property being divided. See *Macy v. Macy*, 32 Neb. App. 258, 995 N.W.2d 899 (2023). As to LRC's bank accounts and building and equipment, in the parties' joint property statement submitted to the court, the parties both agreed to value these assets as of the January 7, 2022, balance sheet. Similarly, in their joint property statement, the parties stipulated to the value of the retirement

- 14 -

accounts as of January 13, 2021. The court simply adopted these stipulated values. A party cannot complain of error which the party has invited the court to commit. See *Lizeth E. v. Roberto E.,* 317 Neb. 971, 12 N.W.3d 809 (2024).

As to LRC's prepaid expenses and crop inventory, Larry failed to provide the court with a value of those assets as of November 2023. In order to equitably ascertain figures for the chosen valuation date, the district court took an average from prior periods in order to obtain a reasonable allocation for this time period. Under these circumstances, we find that the court's methodology was reasonable and find no abuse of discretion associated with utilizing an average to ascertain this missing data. This assignment of error fails.

### 2. FAILING TO INCLUDE PIT STOP PROCEEDS IN MARITAL ESTATE

Larry next assigns that the district court erred in awarding Kristine $103,828.96 in cash proceeds from the sale of the Pit Stop but failing to include that amount in the marital estate. Kristine argues that even though the trial court did not include a line item regarding the Pit Stop proceeds in its decree, when viewing the language contained in the decree in concert with language contained in the court's April 30, 2023, temporary order, the court's language indicates that it implicitly found that the Pit Stop proceeds were not subject to property division because the funds had been applied to Kristine's temporary alimony, attorney fees, and expert fees.

The district court's April 30, 2023, order, based upon the parties' joint stipulation for temporary child support and alimony, provides in pertinent part:

3. In lieu of an order for temporary spousal support and expert and attorney fees, [Kristine] shall receive the net cash proceeds from the sale of the Pit Stop with the exception of $14,517.77 that [Larry's] counsel shall hold in trust to pay the annual Pit Stop FCSA payment due July 1, 2023. [Kristine] shall receive the monthly payments from the contract on the Pit Stop during the pendency of this action. The issues regarding how the Pit Stop proceeds are to be allocated between temporary alimony, attorney and expert fees and property division shall be reserved for the trial herein.

Later, in the dissolution decree, the court noted that "almost half of [the Pit Stop] proceeds were used to fund the divorce litigation" and that "[o]ther than this infusion of cash, [Kristine's] only source of income comes from the $24,000.00 annual dividend she receives from the Law family farms."

We find that, contrary to Larry's argument, the district court noted in the dissolution decree that the Pit Stop cash proceeds had been used by Kristine to fund the parties' litigation. Notably, the court included the remaining $120,000 due on the promissory note from the sale of the Pit Stop in the marital estate. We further note that the parties stipulated that "[i]n lieu of an order for temporary spousal support and expert and attorney fees, [Kristine] was awarded the net cash proceeds from the sale of the Pit Stop" except for $14,000 which was held in trust by Larry's counsel. Parties are bound by stipulations that are voluntarily made, and relief from such stipulations is warranted only under exceptional circumstances. *Shearer v. Shearer*, 270 Neb. 178, 700 N.W.2d 580 (2005); *Lasu v. Lasu*, 28 Neb. App. 478, 944 N.W.2d 773 (2020). Since the parties agreed that the cash proceeds from the sale of the Pit Stop would be awarded to Kristine in

lieu of temporary spousal support and expert and attorney fees, we find no error in the district court not including this amount in its division of the parties' marital estate. This assignment of error fails.

### 3. IMPROPER VALUATION OF WALLACE HOME

Third, Larry contends that the district court erred in including building improvements that were already included in the value of the Wallace Home. Larry argues that the court included as marital assets the Wallace Home valued at $665,000 while also including building and equipment valued at $338,167 and storage bins valued at $100,000. He claims that valuing the Wallace Home at $665,000 and including additional line items for the building, equipment, and storage bins, effectively overstated the marital estate by $438,167.

In their joint property statement, both Larry and Kristine valued the Wallace Home at $750,000, and Larry testified that the premarital value of the Wallace Home was $85,000. This valuation was corroborated by LRC's February 5, 2001, balance sheet that listed the value of the Wallace homestead including the house, bins, and building at $85,000. This left the marital value of the Wallace Home at $665,000 ($750,000 - $85,000). And Larry acknowledged during his testimony that the increase of $665,000 would appropriately be considered marital property. We cannot find error where the district court relied on Larry's own testimony calculating the value of the Wallace Home based upon the parties' current valuation and Larry's testimony that the premarital portion of the Wallace Home, which included the home, acreage, and property located thereon, was $85,000. And although Larry argues that the court double counted the building, equipment and bins by separately assigning a specific value to them, Larry testified that there were different bins on other quarters of his land, and "building and equipment" were listed as separate line items in addition to the homeplace, which was separately listed at $750,000 on the 2023 balance sheet admitted at trial. Accordingly, on this record, we find that the district court did not abuse its discretion in separately including values for the Wallace Home and values for the bins, building, and equipment in its final valuation. This assignment of error fails.

### 4. DISSIPATION OF LRC BY GIFT

Larry next contends that the district court erred in finding that Larry dissipated his LRC stock and in awarding him the full value of LRC non-real-estate assets. Larry argues that the LRC shares themselves were premarital property which gave him the right to manage them as he saw fit and Larry's motive in gifting the shares away was to effectuate his estate plan with his son Andy who was actively involved in the farming operation.

As this court explained in *Schwensow v. Bartnicki*, 32 Neb. App. 798, 818-19, 6 N.W.3d 549, 565-66 (2024):

> Dissipation of marital assets is generally defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown. *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001). As a remedy, the marital assets dissipated by a spouse for purposes unrelated to the marriage should be included in the marital estate in dissolution actions. *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009). The party alleging dissipation of marital property has the initial burden of production and persuasion. *Schnackel v. Schnackel*, 27 Neb. App. 789,

937 N.W.2d 234 (2019). Although Nebraska case law does not precisely define when a marriage is undergoing an irretrievable breakdown, this court has previously declined to conclude that such breakdown can be found only when the parties are estranged or have separated. See *Malin v. Loynachan*, 15 Neb. App. 706, 736 N.W.2d 390 (2007).

And in *Schnackel v. Schnackel*, 27 Neb. App. 789, 808-09, 937 N.W.2d 234, 252 (2019), this court explained:

Although no published Nebraska cases specifically articulate the burden of proof with regard to dissipation of marital assets, our case law appears to place the initial burden on the party alleging dissipation, and after sufficient evidence is produced, the burden shifts to the dissipating spouse to prove that the funds were spent for marital purposes. See, *Harris v. Harris, supra*; *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000). This is consistent with the standard set forth in a legal treatise, which provides that a party alleging dissipation of marital property has the initial burden of production and persuasion. 27C C.J.S. Divorce § 998 (2016). See, also, 2 Brett R. Turner, Equitable Distribution of Property § 6:105 (4th ed. 2019). The waste and dissipation of marital assets must be established by a preponderance of the evidence. 27C C.J.S., *supra.* After a party establishes a prima facie case that monies have been dissipated, the burden shifts to the party who spent the money to produce evidence sufficient to show that the expenditures were appropriate. *Id.* The spouse charged with dissipation bears the burden of establishing by clear and convincing evidence how the funds were spent. *Id.* Vague and general testimony that marital assets were used for marital expenses is inadequate to meet the spouse's burden to show by clear and specific evidence how the funds were spent, and the trial court is required to find dissipation when the spouse charged with dissipation fails to meet that burden. *Id.*

The district court found that Larry's alleged gift of 49 percent of LRC Stock to Andy constituted a dissipation of marital assets. We find no abuse of discretion associated with this finding. The district court's finding was supported by evidence including that the timing of the gift was in 2018 when evidence in the record provides that the marriage was experiencing a breakdown; that Larry did not inform Kristine that he gifted 49 percent of LRC to Andy and she did not learn of it until after the divorce was filed; that Larry filed forms and tax returns to the IRS after the alleged gift which indicated that he still owned 100 percent of LRC's stock; that none of LRC's financial statements disclosed any gifts or inheritances; that Larry did not tell his corporate lender or accountant about the gift; that the transfer was for less than full consideration (in this case no consideration); and Larry continued to receive all the benefits from LRC despite the alleged gift of 49 percent to Andy. And, although Larry argues his intent was simply to provide for Andy, who had chosen to farm with him, so as to avoid the conflicts which arose among his own siblings when similar estate planning was not effectuated, we find the timing of the alleged gift when considered with the manner the farm's ownership was subsequently represented and governed refutes Larry's testimony. And although a portion of LRC was not a marital asset, large portions became marital due to the active efforts of Larry in farming LRC's property during the parties' marriage. We find no abuse of discretion associated with the court's determination that

- 17 -

Larry's alleged transfer of 49 percent of LRC to Andy in 2018 constituted a dissipation of marital assets at a point in time when the marriage was undergoing an irretrievable breakdown. As such, the district court did not err in considering the full market value of LRC in its property division.

### 5. PRESENT VALUE OF FUTURE LEASE PAYMENTS AND PRIOR LEASE PAYMENTS

Fifth, Larry contends that the district court erred in allocating to him $768,103.49, which was the full present value of the farm equipment he leased to Andy, while also including an additional $200,000 in lease payments that were paid by Andy and received and applied by LRC prior to the valuation date. In support of his contention, Larry argues that he only owned 49 percent of LRC at the time the lease was made making a full allocation of the equipment inappropriate, and that including the $200,000 in payments received by LRC under the lease agreement before the valuation date, amounted to double counting of those proceeds.

Regarding Larry's first claim that he did not own 100 percent of LRC when the lease was executed, we previously determined that the evidence supported the district court's determination that the proposed transfer of 49 percent of LRC to Andy constituted a dissipation of marital assets and justified the full inclusion of LRC in the marital estate as of the division date. Therefore, as it relates to Larry's argument that the court should have valued the lease at 51 percent, that assignment of error fails.

However, because the court set the valuation date of the equipment that was the subject of this lease as of November 2023, we agree with Larry that the court should not have included the $200,000 in payments already paid by Andy and received by LRC under the lease agreement. That money was received and became a part of LRC's balance sheet, all of which was separately valued as of November 2023. In analyzing whether to include the $200,000 of payments made before the valuation date, the district court found that, "in reviewing the evidence, the court cannot conclusively conclude the lease payments were applied [to LRC] to reduce debt or acquire additional equipment." But for over 20 years after the parties' marriage, there was a constant flow of production of income, payment of debts, and allocation of funds, all of which could presumably be supported by ledgers and bank statements over the course of time. That said, an analysis of each such transaction would be time and cost prohibitive in a trial of this nature and we find it onerous to isolate on this single transaction and require greater accounting detail than what was generally supplied for all other assets and debts over the nearly 20-year history of LRC in assigning value. Instead, Larry's unrefuted testimony established that Andy had paid $200,000 under the lease which amounts were received by LRC and were used to reduce the balance on LRC's line of credit. And, as the Nebraska Supreme Court held in *Burgardt v. Burgardt*, 304 Neb. 356, 365, 934 N.W.2d 488, 495 (2019),

> While documentary evidence may be more persuasive, it is not absolutely required. In a case where the husband did not produce bank statements proving the premarital balance of his bank accounts but the wife did not contest the values he listed on a joint property statement, we found an abuse of discretion by the trial court in failing to set off the value of premarital bank accounts.

In this case, this individual transaction was one of many that were generally supported through the balance sheet transactions and testimony regarding LRC's operations. And although that testimony does not "conclusively" identify that the cash payments were made to LRC and applied to its line of credit, we find the unrefuted testimony of Larry, together with our review of the balance sheets, satisfied Larry's burden of proof on this issue. As such, to avoid double counting this payment, we modify the district court's division as it relates to including the $200,000 received by LRC prior to the division date as a separate asset.

### 6. INCLUSION OF LRC'S MACHINERY AND EQUIPMENT IN MARITAL ESTATE

Sixth, Larry contends that the district court erred in including $184,537 of LRC's machinery and equipment in the marital estate. Larry argues that, after the lease agreement between LRC and Andy, LRC retained some machinery and equipment but that the 2023 Financial Statement listing a value of $184,537 was nothing "other than a historical entry of assets accumulated by LRC." Brief for appellant at 31.

After Andy's September 2021 lease of LRC's machinery and equipment, LRC's January 7, 2022, balance sheet continued to list machinery and equipment valued at $780,040. A description of the machinery and equipment and the values associated therewith are included in the balance sheet documentation. Larry explained that the January 2022 balance sheet continued to list the machinery and equipment because Andy had leased, not purchased, the machinery and equipment and that there was a corresponding entry under "Other Noncurrent Assets" that reflected a $900,000 note/contract receivable from Andy regarding the machinery and equipment buyout.

However, according to the January 11, 2023, balance sheet, once the leasehold property was apparently removed as an asset, the balance sheet continued to reflect certain equipment retained by LRC that was not included in the lease. Additionally, Larry's own testimony provided that LRC's balance sheet continued to list machinery and equipment because it still owned those items as "historical assets," but those items could not be traced back as prior to 2002. Accordingly, in light of the evidence that LRC continued to retain some equipment and machinery not included in the lease, and Larry's testimony indicating LRC still owned some equipment and machinery following the lease agreement, the district court did not err in including the $184,537 in machinery and equipment identified in LRC's January 11, 2023, balance sheet. This assignment of error fails.

### 7. AWARDING CFI AND LRC ASSETS WITHOUT CONSIDERING CFI AND LRC DEBT AND DEBT REDUCTION

Larry next assigns as error that in valuing LRC and CFI, the court erred in including a reduction of premarital debt from both entities as marital assets, while failing to include corporate debt incurred during the marriage as liabilities in the court's ultimate property division.

In assessing the marital value of LRC and CFI as of the division date, the court recognized it had to account for the premarital value of both entities which Larry brought to the marriage in 2002. In considering how best to value the businesses as it related to the 20-plus year marriage, the court stated:

> Candidly, the determination of the marital value, if any, of each of the two farming entities, by using the stock valuation approach would have saved the parties--and this

Court--numerous hours of weighing and considering competing valuations and other division issues impacting the parties and the composition of [the] marital estate. However, this case presents an issue involving the appreciation of non-marital farm ground, which, understandably, prevents the use of the stock valuation approach for LRC and CFI.

Instead, the court followed the parties' lead and proceeded to value the market values of the various individual assets and some liabilities of LRC and CFI when determining their individual market value in relation to the marital estate. For instance, as we explain more thoroughly in other portions of this opinion, the court included only the active appreciation of the land since 2002, while including the entirety of the machinery and equipment, because the current equipment could not be traced to 2002. Likewise, the court included the value of cash in LRC and CFI's bank accounts, current prepaid expenses, and the current crop inventory because all represented current assets produced through Larry's farming efforts during the marriage. But in doing so, the court only considered a portion of the debt in both LRC and CFI. And in that regard, the court's analysis of liabilities was mostly limited to considering what premarital debt was paid with marital funds through Larry's active farming efforts in recognition that such could be considered a marital asset. See *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017) (non-owning spouse is entitled to some benefit when marital funds have been expended to improve or reduce debt on other spouse's nonmarital property). But as this court stated in *Else v. Else*, 5 Neb. App. 319, 324, 558 N.W.2d 594, 598 (1997), "[t]o determine the value of a closely held corporation, the trial court may consider the nature of the business, the corporation's fixed and liquid assets at the actual or book value, the corporation's net worth, marketability of the shares, past earnings or losses, and future earning capacity."

Here, clearly the district court considered LRC and CFI's fixed and liquid assets in determining their value, but in doing so, failed to consider some of the companies' liabilities. As it relates to LRC and CFI's liabilities, the court analyzed the premarital debt of the corporations at the time the parties were married to determine what marital asset value was necessary for retirement of that debt. But in doing so, the court failed to consider some of the current debt of both corporations as of the November 2023 valuation date as it related to the overall value of those entities.

Since Larry and Kristine's marriage in 2002, Larry has operated LRC and CFI to produce marital income for the parties. In doing so, through the auspices of the corporations, Larry's efforts produced new equipment purchases, cash, prepaid expenses for the next year's crop yield, crop inventory, some additions of land, some redemptions of stock from other CFI shareholders, and a spin-off of some assets and debt in CFI to Andy. But as to all the farming operations, it continually involved the use of debt to produce that marital income. So as of the division date, to properly value LRC and CFI, that valuation must also include a full analysis of the corporations' ongoing and current debt obligations. However, only a portion of that debt was considered. As such, the court's property division ultimately included the value of marital assets without offsetting the debt in both corporations that was utilized to produce those assets as of the November 2023 valuation date. We find this an abuse of discretion in that it resulted in an overvaluation of LRC and CFI.

In order to fully analyze the debt positions of both LRC and CFI, we must consider the debt of both corporations at the time of the parties' marriage in 2002 and analyze how those debt

positions evolved during the course of the marriage and at the valuation date. In doing so, we must discuss LRC and CFI separately.

As of 2002, Larry owned 100 percent of LRC and its balance sheet as of February 5, 2003, showed total liabilities of $1,120,204. Most of that debt related to funds borrowed from Adams Bank and Trust with the two largest individual note balances reflecting $300,000 for an operating loan and $325,172 listed as a refinanced loan. The remaining loans appear to relate to individual equipment purchases. By 2023, total liabilities for LRC were $1,767,236. By then, LRC was banking with FCSA and the individual notes consisted of a "real estate" loan of $1,529,878; a primary residence loan of $84,985 which appears to relate to the Paxton Home; a loan for "two new pivots" valued at $138,000; and an $8,478 operating loan.

In evaluating the liabilities, the district court's analysis in the decree appears to be limited to ascertaining the paydown of premarital debt with marital funds, which Kristine requested that the court include as an asset. In analyzing the matter, the court rejected Kristine's contention that the Adams Bank and Trust loan was paid down noting that its loan value had increased by 2003. However, the court acknowledged that in 2012, LRC changed banking institutions from Adams Bank and Trust to FCSA. As it relates to the refinance, the court held:

> Later in their marriage, LRC developed a lending and business relationship with [FCSA]. Based on the May 31, 2012, balance sheet summary prepared by [FCSA for LRC] had a real estate loan balance of $1,986,561.00. . . . In the January 7, 2022, balance sheet summary, LRC's real estate loan with [FCSA] was reduced to $1,633,491.00. . . . Between 2012 and 2022, LRC lowered its real estate indebtedness to [FCSA] by $353,070.00. In this regard, the Court finds that the sum of $353,070.00 shall be reinstated and included in the composition and valuation of the marital estate.

In doing so, the court treated the paydown of the FCSA loan acquired in 2012 as an asset because it reasoned the paydown constituted a repayment of nonmarital debt with marital funds. However, a review of the balance sheet from 2012 suggests a different result. By January 26, 2012, LRC's balance sheet showed total liabilities of $883,786. However, when LRC refinanced with FCSA in 2012, its total liabilities were $2,776,043. Based on our de novo review of the details contained in LRC's balance sheets, we find that the increase was due primarily to an increase in LRC's operating line, the purchase of the additional quarter section of land for $736,000, and the purchase of new machinery and equipment. Although the court valued these assets as marital property acquired during the marriage, it then treated the subsequent paydown of the 2012 loan owed to FCSA as a paydown of premarital debt even though the debt the court analyzed was incurred to purchase or produce marital assets. We find the court's treatment of the reduction of debt first incurred in 2012 as a marital asset was an abuse of discretion.

Instead, we believe the proper analysis involves comparing LRC's 2002 debt balance in the amount of $1,120,204 to LRC's 2023 debt in the amount of $1,767,236. The difference is a $647,032 increase in LRC's debt which represents additional debt that should reduce the value of the marital assets as opposed to increase it. Notably, in valuing the 160 acres acquired by LRC in 2012, we note the court accepted the value of that property as $108,000. In reviewing the financial statements, that value was ascertained by taking the property's $844,000 market value as of 2023 and reducing it by the $736,000 loan used to acquire it. By including this liability here, the court

properly reduced the value of the marital estate by an amount that nearly equates with the increase in liabilities from 2002 to 2023. As such, by removing the $353,070 entry which the court treated as an asset due to the FCSA loan reduction after 2012, we find that the valuation of the assets and liabilities of LRC is equitably stated.

We undergo a similar analysis of CFI. As of 2002, CFI's liabilities were $261,456, and Larry owned 11 percent of the company. By 2023, CFI's liabilities were $929,269, and Larry owned 100 percent of CFI. Again, the court did not provide a full analysis in its decree of the difference in liabilities over time. But the court did observe that the liabilities remaining were primarily the result of CFI's redemption of Larry's siblings' stock, which originally resulted in three loans acquired by the company in 2017 in the total amount of $2,000,000. Andy separately purchased shares from one of Larry's siblings, and prior to 2023, CFI spun off a portion of CFI's real estate and nearly $1,000,000 of the redemption notes to Andy leaving Larry owning 100 percent of CFI in 2023. As it relates to the loans remaining in CFI as of 2023, the court again included a value for the subsequent reduction of the notes acquired in 2017 as an asset of the marital estate reasoning:

> In her brief and in her proposed property division analysis, [Kristine] requests that the Court reinstate CFI's debt reduction relative to the stock purchase debts in the amount of $218,236.00. She also requests reinstatement of additional debt reduction regarding CFI's obligation to Eugene Coppersmith in the amount of $26,623.00; Larry's stock purchase of 4 shares of CFI stock from Virginia totaling $28,872.00; and the $50,000.00 downpayments made by CFI at the closings on the stock purchase agreements.
>
> This Court concurs that reinstatement of the CFI debt as requested by [Kristine] is amply supported by the evidence as well as supported under the law.

The court subsequently included the reduction of this debt from 2017 to 2022, along with cash paid to acquire 100 percent of CFI, as a marital asset, albeit as a reduced percentage because Larry owned only 50.69 percent of CFI at the time of the redemption. As such, the court included $164,779.07 as a marital asset.

Again, as of 2002, CFI's liabilities were only $261,456. As of 2023, CFI's liabilities were $929,269. The difference in debt related primarily to the remaining redemption notes in CFI as of 2023 along with $80,888 of current liabilities and $30,268 of other liabilities. In valuing CFI, the court utilized 100 percent of the assets in CFI save only the real estate that was premarital property. The court used 100 percent because Larry owned 100 percent of CFI as of the valuation date. And the court reduced the value of those marital assets by the $80,888 in current liabilities and $30,268 in other liabilities, and as noted above, the court included a reduction of the redemption debt incurred in 2017 and cash paid to acquire shares in CFI as an asset in the amount of $164,779.07.

But the redemption debt was incurred in purchasing a marital asset, which resulted in Larry owning 100 percent of CFI by 2023 when he only owned 11 percent in 2002. For the court to include 100 percent of the marital assets of CFI without including the debt associated with the cost to acquire the asset was an abuse of discretion as was the inclusion of the reduction of the marital debt paid with marital funds and cash used to acquire the CFI shares.

In order to remedy these errors, we must remove a portion of the $164,779.07 included as an asset. As it relates to the $667,813 difference in debt between 2002 and 2023, the court only

included the $80,888 in current liabilities and $30,268 in other liabilities in its computation. That left $556,657 not included in the computation. But in relation to those liabilities, we note that the court included only $1,621,965 of CFI's total asset value, $4,620,645, in its computation of the marital estate. The court did not include the premarital real estate owned by CFI or its passive appreciation of $2,278,680. Taken as a fraction, the court included 35 percent of the asset value of CFI in the marital estate. Because the redemption debt was acquired to purchase the entirety of CFI, both marital and nonmarital, we believe equitably the same percentage of debt should be included in reducing the value of the estate. Accordingly, we reduce the value of the marital estate by $194,830 representing the allocable share of debt used to acquire the shares of stock in CFI. As to the debt and cash paid and paid down to fund the acquisition of CFI, we likewise reduce that calculation by 35 percent which represents debt allocable to marital assets. That reduction is $57,672 (35 percent of $164,779).

### 8. Alleged Errors Regarding Appreciation of LRC and CFI Ground and Double Counting of 40 Acres

Larry's next assignment of error is that the district court erred in including the appreciation of LRC and CFI ground and that the court double counted the increase in the 40 acres. Larry argues:

> The Court determined Larry's efforts in farming LRC and CFI ground actively increased the value of LRC's holdings by $510,248 and of CFI's holdings by $601,320. . . . The Court relied upon Oltman's testimony regarding the express appreciation of both LRC and CFI. . . . The Court noted that "Oltman, using unrefuted evidence from Marland, compared the LRC and CFI's increases to the historical averages for the southwest district for irrigated cropland." . . . The Court also noted that Larry reworked some wells in 2012 and lowered a well in 2018. Although the Court purportedly went through the active appreciation analysis, the Court's conclusion of appreciation was error.

Brief for appellant at 35.

As the Nebraska Supreme Court explained in *Higgins v. Currier*, 307 Neb. 748, 755-56, 950 N.W.2d 631, 637 (2020):

> The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of an asset's appreciation or income. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). Under the rule, accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse. *Id.* Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property. *Id.* Passive appreciation is appreciation caused by separate contributions and nonmarital forces. *Id.* The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income. *Id.*

Here, the district court relied on the testimony from Marland and Oltman in determining whether there was any active appreciation in LRC and CFI. Marland testified that in utilizing an annual report published by the University of Nebraska-Lincoln, the net passive increase in value of land in the southwest district of Nebraska was 8.69 percent which equated to a net passive increase of $3,733 per acre. Oltman, in considering Marland's calculation of passive appreciation, calculated the increase in value in excess of what the passive appreciation was as a result of Larry's farming tactics. Oltman determined that for a center pivot irrigated plot of land, the 2002 value was $1,167 per acre and 2023 value was $5,475 per acre. Based upon these values, Oltman calculated that the total value increase on CFI's balance sheets for the 20-year period was $2,880,000.

For LRC, Oltman employed a similar analysis but used the 2001 balance sheet coming up with marital appreciation amount of $3,736,090. Oltman utilized Marland's calculation of passive appreciation of real estate to opine that the excess appreciation beyond passive appreciation of CFI's farm ground was $601,320 and LRC's farm ground was $501,248. Oltman's calculations were offered and received into evidence during the trial. We find no abuse of discretion in the court's acceptance of Oltman's calculation of the excess active appreciation due to Larry's active efforts as being more credible than Larry's expert who testified that all appreciation was passive and unrelated to any farming operation.

Larry also argues that "the Court included the increase in the 40 acres of $169,320 and included excess appreciation of $22,270 for the same 40 acres. The Court cannot include both as it effectuates a double counting of the same 40 acres which is error." Brief for appellant at 38.

However, the district court relied on Oltman's testimony regarding the excess appreciation. In calculating the excess appreciation, Oltman specifically subtracted the 40 acres of marital property from the total 299 acres to determine the excess appreciation of the premarital portion of the land only. Oltman calculated it as follows:

| Property | Description | 2023 Value per Acre | 2001 Value per Acre | Total Value Increase | % Increase | 22 yr % Average | Excess Increase |
|---|---|---|---|---|---|---|---|
| 6) Big Pivot 299 (40A marital) | 35-12-35 | $ 4,233 | $ 880 (250A) | $3,353 x 250A = $838,250 | 381% | 17.3% | $22,270 |

Accordingly, because Oltman did not include the 40 acres in determining the excess appreciation, the district court did not err in separately calculating the valuation of the 40 acres. This assignment fails.

### 9. FAILURE TO CONSIDER LAW FARMS

Larry's next assignment of error is that the district court erred in failing to consider the appreciation in Kristine's ⅙ interest in Law Farms. Larry contends that he has farmed Law Farms' land for more than 20 years, that he used the same farming methods on Law Farms' land that he used on LRC's and CFI's land, and that since the court included the active appreciation of LRC

and CFI's land in the marital estate, Kristine's share of Law Farms should be treated similarly by including an active appreciation value of $603,204.

We note that the value of Law Farm's land was litigated before the district court. Larry testified regarding the value of Law Farms and in response to Kristine's objections to an offered exhibit, Larry's counsel stated that "the main reason we're here is because of this asset received [by Kristine] during the marriage that we believe is appreciated from the time of [Kristine's mother's] passing until the present." Larry testified that the value of Law Farms at the time of Kristine's mother's death in March 2018 was $3,491,836 and Larry noted that an April 21, 2021, farm loan application for Law Farms listed a present value of $7,111,065. Thus, we find that the general issue of the appreciation of Law Farm's land was raised before the district court.

However, we agree with Kristine that Larry failed to raise the specific issue of what, if any, of the increase in value of Law Farms' land was active appreciation as opposed to passive appreciation. Larry did not present any evidence distinguishing what amount of the appreciation was passive appreciation and what amount was active appreciation. Accordingly, we agree with Kristine that Larry failed to raise this specific issue before the district court. A trial court cannot err in failing to decide an issue not raised, and an appellate court will not consider an issue for the first time on appeal that was not presented to or passed upon by the trial court. *Walker v. Probandt*, 29 Neb. App. 704, 958 N.W.2d 459 (2021). Accordingly, we find that this specific issue was not raised before the district court, and we decline to address it for the first time on appeal.

### 10. Disregarding Expert Testimony in Calculating Marital Estate and Equalization Payment

Larry's next assigned error is that the district court erred in disregarding the testimony of Cox and Haskell when calculating the marital estate and equalization payment. He argues the court erred in including 100 percent of the line-item assets of LRC and CFI; 100 percent of the excess appreciation of the real estate of LRC and CFI; and in excluding LRC and CFI's existing debt.

Insofar as Larry is assigning error to the credibility determinations governing these witnesses, we reject those claims because as we have often stated, this court may defer to the credibility findings of the trial court who saw and heard the witnesses and made credibility determinations in relation to their testimony. See *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024) (when evidence is in conflict, appellate court considers and may give weight to fact that trial court heard and observed witnesses and accepted one version of facts rather than another). As this might relate to more specific court findings governing the market value of assets or liabilities in relation to this court's ultimate division of property, those specific issues were dealt with in other sections of this opinion.

### 11. Determination of Larry's Income

Larry next assigns as error that the district court erred in determining his income for child support and alimony. He argues that the court utilized Kristine's expert, Oltman, to assess Larry's finances. He then identifies issues with Oltman's analysis in calculating his income. The flaw in this claim is that the income imputed to Larry by the district court was included in an exhibit prepared by Larry's expert and which was received into evidence for demonstrative purposes. The exhibit included several child support calculation worksheets. One of those worksheets used a

5-year average of Larry's income, 100 percent of LRC, and $100,000 in loan payments to come up with a total gross income for Larry of $28,015 per month. This is the figure that the district court used for Larry's monthly income. A party cannot complain of error which the party has invited the court to commit. *Lizeth E. v. Roberto E.*, 317 Neb. 971, 12 N.W.3d 809 (2024). Since the court's determination of Larry's income is the same as one of Larry's proposed child support worksheets, he cannot now complain that the court erred in relying upon his evidence. This assignment of error fails.

## 12. ALIMONY

Larry's final assignment of error is that the district court erred in awarding alimony to Kristine. Larry acknowledges that the facts could support a finding of alimony but argues that the district court failed to consider whether an award of alimony, in any amount, was reasonable. Larry argues that the amount of alimony awarded is unreasonable because, among other things, Kristine was awarded a large equalization judgment; Kristine was awarded a fully paid off home and vehicle; Kristine was awarded the parties' retirement accounts; Kristine was awarded the Pit Stop proceeds; Kristine was awarded her interest in Law Farms without any consideration for active appreciation; Kristine was not required to account for missing Pit Stop funds; Larry's income is insufficient to support the alimony award; the court found that Kristine's expenses were overstated and not based in fact; Kristine could return to nursing with 2 years of education; and the alimony award was meant to "punish" Larry. Brief for appellant at 47.

In a dissolution of marriage proceeding, Neb. Rev. Stat. § 42-365 (Reissue 2016) allows a court to order payment of such alimony by one party to the other and division of property as may be reasonable. What constitutes a reasonable alimony award and division of marital property depends on the facts of each case, but to make that determination, a court may consider, among other things, the circumstances of the parties, the duration of the marriage, and the history of the contributions to the marriage by each party, including contributions to the care and education of the children. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023). Section 42-365 further provides:

> While the criteria for reaching a reasonable division of property and a reasonable award of alimony may overlap, the two serve different purposes and are to be considered separately. The purpose of a property division is to distribute the marital assets equitably between the parties. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate.

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. *Knapp v. Knapp*, 32 Neb. App. 669, 4 N.W.3d 415 (2024). The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

Regarding Larry's claims that an award of alimony was not appropriate because Kristine was awarded the equalization payment, her home and vehicle, the parties' retirement accounts, the Pit Stop proceeds, and that Kristine was awarded her interest in Law Farms without any consideration for active appreciation, these assets were awarded as part of the division of the parties' marital property which purpose is different than the purpose of an alimony award. And concerning Larry's argument that Kristine was not required to account for missing Pit Stop funds, there was no evidence that the missing funds were ever attributed to Kristine or in any way received for her benefit.

Finally, Larry claims that the alimony award was not reasonable because his income is insufficient to support the alimony award, that Kristine has her interest in Law Farms, and that Kristine could return to nursing. As we noted in the previous section, we agreed with the district court regarding its determination of Larry's income for the purposes of calculating child support and alimony. We thus reject his claim that his income was insufficient to support the alimony award. We also note that the district court considered the income that Kristine receives from her interest in Law Farms, which is her sole source of income and equates to approximately $24,000 per year. And although the court found that Kristine's anticipated monthly expenses were overstated, the court did find that she was reasonably likely to incur monthly expenses of approximately $5,500, which her expected income from Law Farms would not cover.

Further, Larry's argument that Kristine could go back to school for 2 years and return to nursing ignores that Kristine has committed her life to caring for Eden who has extensive medical issues that will require Kristine's care, and which would leave little, to no, time to obtain a recertification of her nursing license. And even if Kristine were to recertify her nursing license, the substantial amount of time required to care for Eden would make it difficult, if not impossible, for Kristine to also engage in full-time employment. We further reject Larry's claim that the alimony award was meant to "punish" him. The court's award of alimony was based upon detailed and thoughtful analysis of both the law and the facts of this case. Larry's claim that the alimony award was unreasonable fails.

### 13. CALCULATION OF PROPERTY DIVISION TOTALS

Applying the adjustments to the district court's property division worksheet made applicable by our findings set forth above, the revised property division (rounded to the nearest dollar) should be adjusted as follows:

|  | Larry | Kristine | Total Estate |
|---|---|---|---|
| Allocation of Property: |  |  |  |
| Prior to Adjustment | $6,782,579 | $575,280 |  |
| Adjustment for Lease Payments Received | ($ 200,000) |  |  |
| LRC Adjustment for Debt Reduction | ($ 353,070) |  |  |
| CFI Debt Adjustment | ($ 57,672) |  |  |
| CFI Additional Debt | ($ 194,830) |  |  |
| Adjusted Total | $5,977,007 | $575,280 | $6,552,287 |

To determine the new equalization payment, we take the difference in the total marital estate of $6,552,287 and divide by 2 leaving us with each party's share of the marital estate at $3,276,143.50. We then subtract the $575,280 already awarded to Kristine from her share of the marital estate to reach an equalization payment of $2,700,863.50.

## VI. CONCLUSION

Based upon the foregoing analysis, we affirm the order of the district court as modified.

AFFIRMED AS MODIFIED.